599 F.2d 1333
 13 ERC 1497, 9 Envtl. L. Rep. 20,590
 ATLANTA COALITION ON the TRANSPORTATION CRISIS, INC., etc.,
et al., Plaintiffs-Appellants,
v.
ATLANTA REGIONAL COMMISSION, etc., et al., Defendants-Appellees,
Metropolitan Atlanta Rapid Transit Authority, Defendant
Intervenor-Appellee.
 No. 77-1921.
 United States Court of Appeals,
Fifth Circuit.
 Aug. 2, 1979.
 
 John W. Vardaman, Jr., Washington, D. C., John R. Myer, Atlanta, Ga., for plaintiffs-appellants.
 Arthur K. Bolton, Atty. Gen., Roland F. Matson, Asst. Atty. Gen., Robert S. Stubbs, II, Exec. Asst. Atty. Gen., Atlanta, Ga., for Downing Musgrove, Ga. Dept. of Transportation, Frank Harscher, III and Ga. State Tollway Authority.
 William D. Mallard, Asst. U. S. Atty, Richard L. Chambers, 1st Asst. Atty. Gen., Marion O. Gordon, Sr. Asst. Atty. Gen., Atlanta, Ga., Edmund B. Clark, Atty., App. Section, Land & Nat. Res. Div., Washington, D. C., Carl Strass, Dept. of Justice, Washington, D. C., for federal defendants-appellees.
 R. William Ide, III, Bettie W. Driver, Anne Emanuel, Atlanta, Ga., for Metropolitan Atlanta RTA.
 William R. Bassett, Harvey M. Koenig, Atlanta, Ga., James W. Moorman, Asst. Atty. Gen., Jacques B. Gelin, Atty., Dept. of Justice, Washington, D. C., for Atlanta Regional Commission.
 Appeal from the United States District Court for the Northern District of Georgia.
 Before BROWN, Chief Judge, AINSWORTH, Circuit Judge, and CAMPBELL*, District Judge.
 JOHN R. BROWN, Chief Judge:
 
 
 1
 The issue in this case is whether the defendants the Atlanta Regional Commission (ARC), the Georgia Department of Transportation (GaDOT), the Metropolitan Atlanta Rapid Transit Authority (MARTA), and the United States Department of Transportation (USDOT) must prepare an environmental impact statement (EIS) on the Regional Development Plan (RDP), the long-range transportation systems and land use planning guide for the Atlanta area.[1] We hold that the RDP is not a "recommendation or report on a proposal for major Federal action" within the meaning of § 102(2)(C) of the National Environmental Policy Act of 1969 (NEPA). We therefore affirm the District Court's judgment in favor of the defendants.
 
 
 2
 * This litigation began in March of 1974 when the Atlanta Coalition on the Transportation Crisis (ACTC) a coalition of neighborhood, civil, community, and environmental organizations the Eighth Ward Civic Association, Inman Park Restoration, Inc., and various named individuals brought suit against ARC, GaDOT, USDOT, and their officers. In Count I of their five-count complaint, the plaintiffs sought a declaratory judgment that the NEPA required the defendants to prepare an impact statement on the RDP, which was then being developed by ARC. In September of 1974, MARTA was granted leave to intervene as party-defendant. All parties then moved for partial summary judgment on Count I, the essential facts not being in dispute. In July of 1975, Judge O'Kelley granted summary judgment on Count I to the defendants, holding that the development of the RDP was not "major federal action" and that preparation of an EIS on the RDP was not practical because of its tentative, preliminary, and general nature.
 
 
 3
 Shortly thereafter, on September 23, 1975, the RDP was adopted by ARC. The plaintiffs then moved for a preliminary injunction restraining the implementation of projects included within the RDP. The motion alleged that a "central portion" of the RDP was the proposal for widening Interstate 85 from four lanes to as many as sixteen. It further alleged that a draft impact statement on the widening of I-85 was being circulated and that studies of other segments of the RDP were being prepared. A preliminary injunction should issue, the plaintiffs argued, because NEPA required the preparation of an EIS on the adopted RDP before implementation of the I-85 widening or any other proposed project. In this same vein, they contended as well that the draft statement on the I-85 widening was inadequate because it did not address the environmental impact of the entire RDP. Judge O'Kelley denied the motion, holding that "it is unnecessary for this Court to resolve the substantive issues raised by the plaintiffs' motion." Since the Court had resolved adversely to the plaintiffs their claim in Count I "that an EIS was required on the RDP prior to its final adoption and implementation," and since "the facts and allegations raised by the plaintiffs' motion for preliminary injunction involve entirely different legal questions and considerations which are not a part of this case," Judge O'Kelley reasoned, the motion for a preliminary injunction raised issues outside the scope of the pending action.
 
 
 4
 Approximately three months later, the District Court entered a consent order dismissing without prejudice the remaining counts of the complaint. The plaintiffs have appealed the District Court's order granting partial summary judgment on Count I and that denying the preliminary injunction.
 
 II
 
 5
 Because it is central to the plaintiffs' theory and to an understanding of the facts and legal issues in this case, we first describe the federal involvement in urban transportation systems planning.[2] The relevant statutes and regulations are the Federal Aid Highways Act, 23 U.S.C.A. §§ 101-156, especially § 134, the Urban Mass Transportation Act, 49 U.S.C.A. §§ 1601-1618, especially § 1607, and the accompanying regulations, 23 CFR Part 450 and 49 CFR Part 613. See generally County of Los Angeles v. Coleman, D.D.C., 1976, 423 F.Supp. 496, Aff'd, 1978, 187 U.S.App.D.C. 396, 574 F.2d 607.
 
 
 6
 Under 23 U.S.C.A. § 134,[3] the Secretary of Transportation cannot approve for federal funding any state or local highway projects for an urban area unless he finds "that such projects are based upon a continuing comprehensive transportation planning process carried on cooperatively by States and local communities in conformance with the objectives stated in this section." Those objectives include "the development of transportation plans and programs which are formulated on the basis of transportation needs with due consideration to comprehensive long-range land use plans, development objectives, and overall social, economic, environmental, system performance, and energy conservation goals and objectives, and with due consideration to their probable effect on" future development. The planning process must "consider all modes of transportation." See also 23 U.S.C.A. § 105(b). To the same effect as respects urban mass transportation projects is 49 U.S.C.A. § 1607:[4] before approving for funding any state or local mass transit projects, the Secretary must find that such projects are "based on the planning process," a process that "shall consider all modes of transportation and shall be continuing cooperative, and comprehensive." Both the Federal Aid Highways Act and the Urban Mass Transit Act provide for federal financial assistance to the urban transportation planning process. 23 U.S.C.A. § 104(f); 49 U.S.C.A. § 1607(d).
 
 
 7
 In order to implement these provisions, the Federal Highway Administration (FHWA) and the Urban Mass Transit Administration (UMTA) have promulgated unified regulations. 23 CFR Part 450; 49 CFR Part 613. These must be complied with before state or local transportation projects in an urban area are eligible for federal funding. Section 450.106 requires the Governor of the State to designate a Metropolitan Planning Organization (MPO) for each urban area which will serve as the planning agency for that area and receive federal planning grants. See 23 CFR Part 450, subpart B. The MPO and the publicly-owned mass transportation services are required by § 450.108(c) to enter into an agreement specifying cooperative procedures for carrying out transportation planning and programming. Sections 450.114, 450.116, and 450.118 specify the required plans and programs the MPO is responsible for developing: the "prospectus and urban planning work program," § 450.114;[5] the "transportation plan consisting of a transportation systems management element and a long range element," § 450.116;[6] and the "transportation improvement program," § 450.118.[7]
 
 
 8
 The most basic of these documents is the § 450.116 transportation plan. The "management element" of this plan must provide for short-term transportation needs and identify recommended improvements to the existing transportation system. § 450.116(b). The "long-range element" must provide for long-term needs and identify new policies, new facilities, and major changes in existing facilities. § 450.116(c). The entire plan must be reviewed annually to confirm its validity and its consistency with current conditions. § 450.116(a).
 
 
 9
 The § 450.118 transportation improvements program (TIP) is required to be developed and updated annually by the MPO in cooperation with state and local officials and transit operators. § 450.306. The TIP is not a "systems plan" like the § 450.116 transportation plan, but rather identifies transportation improvements to be undertaken in the next three to five year period, indicates the priority of each recommended improvement, and estimates the costs and revenues for the period. §§ 450.306, 450.308. The TIP must also include an "annual element," which lists projects proposed for implementation in the next year. 23 CFR Part 450, subpart C.
 
 
 10
 The federal agencies will approve for funding transportation projects in an urban area only if (i) the projects are drawn from the annual element of the TIP and thus, indirectly, from the § 450.116 transportation plan, See §§ 450.318, 450.320; and (ii) the urban area's planning process has been certified as in compliance with Part 450, See § 450.122.[8] Certification, known as "3C" (continuing, cooperative, comprehensive) certification, involves an annual joint review by FHWA and UMTA of the transportation planning process to determine if it "meets or substantially meets" the requirements of Part 450. Certification of the process and inclusion of a project within the § 450.116 transportation plan and the TIP, however, only preserve eligibility for federal funding. The federal agencies are not thereby committed to funding that project; other approvals more specifically related to the particular project must be granted.[9] Similarly, the state and local governments have not committed themselves to seek federal funding by inclusion of projects within the transportation plan and the TIP; they may, if they choose, fund particular projects with non-federal money. And while the federal government provides a great deal of the funding for the planning process, it exercises no control over the projects proposed and improvements adopted at the systems planning level. This is made clear in the supplementary guidelines issued by FHWA and UMTA, published as Appendix A to 23 CFR Part 450, subpart A:
 
 
 11
 The UMTA and FHWA do not intend to prescribe efficiency standards or the particular measures that an urbanized area must adopt to meet the requirement to develop a Transportation Systems Management element. Formulation of an overall policy strategy, assessment of candidate measures, and selection, programming and implementation of actions are clearly a local responsibility to be carried out as part of continuing transportation planning and implementation process.
 
 
 12
 In other words, Part 450 does not authorize the federal government to review the substantive aspects of the plans. Federal review of urban transportation planning is concerned only with whether the planning Process complies with Part 450.
 
 
 13
 In sum, federal involvement in urban transportation systems planning falls into three overlapping, yet distinct, categories: (1) conditioning the availability of federal grant money for a particular project upon the project's being the result of, and consistent with, a comprehensive transportation plan developed according to certain federal requirements, so that the state and local governments must develop such a plan and follow certain procedures if they wish to preserve eligibility for federal funding; (2) certification of the planning process; and (3) federal funding of the planning process.
 
 III
 
 14
 With this background, we now examine the facts of this case. The Atlanta area has been the beneficiary of urban planning since 1949, when the Georgia legislature created the Metropolitan Planning Commission (MPC). Since that time MPC and its more recent incarnations, the Atlanta Region Metropolitan Planning Commission (ARMPC) and ARC, have produced some five comprehensive development plans. The RDP is only the latest of these, and almost certainly will not be the last.
 
 
 15
 ARC was created by state law in 1971. Ga.Laws 1971, No. 5, Metropolitan Area Planning and Development Commissions Created. Under this statute, ARC functions as the coordinating agency for planning and development in the seven-county metropolitan Atlanta area. Section 13 of the statute requires ARC to prepare comprehensive "development guides," which "shall consist of policy statements, goals, standards, programs, and maps prescribing an orderly and economic development, public and private," of the Atlanta area. Section 14 provides that ARC shall "be designated as the official planning agency for all state and federal programs to be carried out in the Area."
 
 
 16
 ARC, GaDOT and MARTA have entered into an agreement expressing their understanding of their roles in transportation planning and development. This so-called Tri-Party Agreement provides for informational and financial input from GaDOT and MARTA, the agencies responsible for implementing transportation projects, into the planning process. While it does not require GaDOT and MARTA to implement ARC's plans, the agreement does require that they "to the maximum extent possible, implement (their) land use and transportation activities in accord with" those plans. Either agency may implement projects not included in ARC's plans, but only after having afforded "reasonable opportunity for appropriate participation and advice from" the other agency and ARC.
 
 
 17
 Pursuant to 23 CFR § 405.106, the Governor has designated ARC as the MPO for the Atlanta area. The Tri-Party Agreement constitutes the agreement between the MPO (ARC) and the publicly-owned mass transportation services (GaDOT and MARTA) required by 23 CFR § 450.108(c). ARC has annually applied for, and received,[10] 3C certification of the planning process for urban Atlanta from FHWA and UMTA, and during the years in question (1972-1975), ARC received over $4 million in federal planning grants.
 
 
 18
 In 1972, ARC began a comprehensive three-year review and update of transportation and land use development plans. The end result, adopted in September 1975, was the RDP. The transportation component of the RDP, perhaps its major focus, constitutes both the transportation "development guide" required by state law and the § 450.116 transportation plan for the Atlanta area. ARC has prepared as well a multi-year TIP and annual elements as required by § 450.118 and 23 CFR Part 450, subpart C.
 
 
 19
 The transportation element of the RDP is a comprehensive "systems plan" for the Atlanta area. It is an analysis of projected regional transportation needs through the year 2000 and identifies the general location and the mode (I. e., highway or mass transit) of recommended transportation corridors to meet those needs. By way of example, one part of the plan proposes to improve rail transit service by extending the rail system into areas not directly served by the MARTA referendum system. The recommended extensions are described as follows:
 
 
 20
 * Northeast Line to Norcross.
 
 
 21
 * Tucker/North DeKalb Line to Cooledge Road.
 
 
 22
 * Southeast Line to Morrow, with potential station sites at Forest Park and Lake City and a terminal station at I-75 near the Southlake development, and the possibility of an additional station in the Hapeville/Mountain View area.
 
 
 23
 * Southwest Line to Fairburn, with stations at the relocated Hartsfield Airport terminal, Chapman Springs Road, Red Oak, and Fairburn.
 
 
 24
 * West Line to Six Flags Road, with an intermediate station at Fulton Industrial Boulevard.
 
 
 25
 * Northwest Line to Elizabeth, with stations at Collier/Defoors Ferry roads, Moores Mill Road, Gilmore, Smyrna, Fair Oaks, downtown Marietta and Elizabeth.
 
 
 26
 * Proctor Creek Branch extended to join the Northwest Line at Gilmore, with an intermediate station at Bolton Road.
 
 
 27
 The corridors described (E. g., "Northeast Line to Norcross") may in some instances be as wide as five miles, and the needs to be served by the corridor may not be anticipated to require actual construction of the corridor project for some twenty years. Future study may require relocation or elimination of a corridor, as may political or financial problems. Moreover, the RDP is not by any means final it will be revised periodically and in all likelihood will be replaced. For all this, the RDP is nevertheless a basic document reflecting important and, to some extent, irrevocable decisions, and one which will serve as a standard for review, comment, and recommendation for all highway and transit programs.IV
 
 
 28
 Section 102(2)(C) of NEPA, 42 U.S.C.A. § 4332(2)(C), requires "all agencies of the Federal government" to
 
 
 29
 (C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on
 
 
 30
 (i) the environmental impact of the proposed action,
 
 
 31
 (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
 
 
 32
 (iii) alternatives to the proposed action,
 
 
 33
 (iv) the relationship between local short-term uses of man's environment in the maintenance and enhancement of long-term productivity, and
 
 
 34
 (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.
 
 
 35
 The issue presented is whether this section requires the preparation of an EIS on the RDP. The defendants concede the necessity of preparing impact statements on individual projects included within the RDP when and as, or if, those projects are submitted to FHWA and UMTA for approval and funding. For example, the 53-mile MARTA referendum system, which began construction in 1973 and is one component of RDP, has been the subject of an impact statement.[11] The plaintiffs' argument, however, is that project EISs alone will not discharge the defendants' NEPA obligation because they will not, and cannot, adequately measure the overall cumulative impact of the RDP, nor will they allow for timely consideration of alternatives on a regional level. The plaintiffs rely principally upon the Supreme Court's opinion in Kleppe v. Sierra Club, 1976, 427 U.S. 390, 96 S.Ct. at 2730, 49 L.Ed.2d at 590.
 
 
 36
 In Kleppe, environmental plaintiffs sought to require federal officials to prepare a comprehensive EIS on coal development in the "Northern Great Plains Region," which encompassed northeastern Wyoming, eastern Montana, western North Dakota, and western South Dakota. Reversing the District of Columbia Court of Appeals, the Supreme Court held that an EIS was not required. In so holding the Court considered three separate theories in support of the court of appeals' decision.
 
 
 37
 First, the Court in Part III of its opinion, 427 U.S. at 398-402, 96 S.Ct. 2718, found that there was no report or recommendation on a proposal for major federal action with respect to the Northern Great Plains Region. Instead, the Court stated, the scope of all federal proposals for action was either local E. g., issuing a lease, approving a mining plan or national E. g., the national coal leasing program. The Court held the absence of a proposal for a regional plan determinative against the plaintiffs in view of the statutory language requiring a "proposed action" before an EIS need be prepared. Id. at 399-401, 96 S.Ct. 2718. Moreover, the Court stated, preparation of an impact statement absent such a proposal would be impractical because "there is nothing that could be the subject of the analysis envisioned by the statute. . . ." Id. At 401, 96 S.Ct. at 2726, 49 L.Ed.2d at 585.
 
 
 38
 Part IV, that part of the Court's opinion rejecting the theory that an impact statement was required since the defendants were "contemplating" a regional plan or program for development, is of little importance to this appeal. In brief, the Court rejected the court of appeals' factual finding that a regional plan was contemplated. It held, furthermore, that even were such a plan contemplated, a court had no authority to "require the preparation of an impact statement to begin at some point prior to the formal recommendation or report on a proposal." Id. at 404, 96 S.Ct. at 2728, 49 L.Ed.2d at 587.
 
 
 39
 The third theory presented to the Court was that, granting the absence of a comprehensive federal plan for development, "a 'regional' impact statement nevertheless is required on all coal-related projects in the region because they are intimately related." Part V, Id. at 408, 96 S.Ct. at 2729, 49 L.Ed.2d at 589. The Court agreed with the plaintiffs that NEPA requires a comprehensive impact statement on related proposals in some situations:
 
 
 40
 Thus, when several proposals for coal-related actions that will have a cumulative or synergistic environmental impact upon a region are pending concurrently before an agency, their environmental consequences must be considered together. 20 Only through comprehensive consideration of pending proposals can the agency evaluate different courses of action.
 
 
 41
 Id. at 410, 96 S.Ct. at 2730, 49 L.Ed.2d at 590 (footnote 21 omitted). Footnote 20 added an important qualification to the Court's acceptance of the plaintiffs' thesis, however:
 
 
 42
 At some points in their brief respondents appear to seek a comprehensive impact statement covering contemplated projects in the region as well as those that already (had) been proposed. The statute, however, speaks solely in terms of Proposed actions; it does not require an agency to consider the possible environmental impacts of less imminent actions when preparing the impact statement on proposed actions. Should contemplated actions later reach the stage of actual proposals, impact statements on them will take into account the effect of their approval upon the existing environment; and the condition of that environment presumably will reflect earlier proposed actions and their effects. . . .
 
 
 43
 Id. at 410 n.20, 96 S.Ct. at 2730, n.20, 49 L.Ed.2d at 590 n.20. But the Court's acceptance of the plaintiffs' theory to this extent did not in the end avail them: after concluding that the responsible agency may, in exercise of its discretion, determine the appropriate region in which environmental effects are so interrelated as to require the preparation of a comprehensive impact statement on all pending proposals, the Court held that the plaintiffs had not shown that the Department of the Interior had acted arbitrarily in choosing as an appropriate region one different than that proposed by the plaintiffs.
 
 
 44
 It is important to keep distinct the three theories considered by the Kleppe Court. The reason is that the plaintiffs here have advanced what we see as essentially two different theories for requiring an impact statement on the RDP, one of which proceeds from Part III of the Kleppe opinion, and one from Part V. In the following part, we consider the plaintiffs' argument from Part III; in the next after that, the argument from Part V.
 
 V
 
 45
 The plaintiffs' argument based on Part III of Kleppe is straightforward: what was lacking in Kleppe, and all that was lacking, was a regional plan. The Supreme Court clearly indicated that had such a plan existed, an impact statement would have been required. Here, of course, there is a regional plan; it follows, according to the plaintiffs, that here there must be an EIS. But while the argument has some plausibility, we think that it does not recognize a critical distinction between this case and Kleppe. In Kleppe, the plan (had there been one) would have been a federal plan, whereas here the plan was prepared by state and local authorities without substantive federal supervision or control, will never be reviewed or approved by a federal agency, and does not commit a federal agency to any action, now or in the future.[12]
 
 
 46
 The fundamental purpose of NEPA "is to compel federal decision makers to consider the environmental consequences of their actions." McGarity, The Courts, the Agencies, and NEPA Threshold Issues, 55 Tex.L.Rev. 801, 804 (1977); Swain v. Brinegar, 7 Cir., en banc, 1976, 542 F.2d 364, 369. Section 102(2)(C) works as an "action-forcing" provision to ensure that agencies have relevant environmental information before them when making decisions.[13] McGarity, supra, at 806. See Kleppe v. Sierra Club, 427 U.S. at 409, 96 S.Ct. 2718; Flint Ridge Development Corp. v. Scenic Rivers Ass'n, 1976, 426 U.S. 776, 786-788, 96 S.Ct. 2430, 49 L.Ed.2d 305; NAACP v. Medical Center, 3 Cir., 1978, 584 F.2d 619, 630, 634; Committee to Stop Route 7 v. Volpe, D.Conn., 1972, 346 F.Supp. 731, 736, Aff'd, 2 Cir., 1974,503 F.2d 601.[14] But Congress did not intend NEPA to apply to state, local, or private actions hence, the statute speaks only to "federal agencies" and requires impact statements only as to "major federal actions." These considerations have informed judicial interpretation of NEPA's "constitution-like" language.[15] Thus, courts have looked to the nature and scope of the federal action being undertaken and have considered the usefulness to the federal decision-making process of the information an impact statement would provide both in determining whether an impact statement is required at all, See Medical Center, supra, and in deciding what kind of statement need be prepared, See Aberdeen & Rockfish R. Co. v. SCRAP (SCRAP II), 1975, 422 U.S. 289, 322-328, 95 S.Ct. 2336, 45 L.Ed.2d 191; Swain v. Brinegar, supra.
 
 
 47
 We delineated the federal involvement in urban transportation systems planning in Part II of this opinion, and in Part III we related that discussion to the operation of the urban planning process in Atlanta. That involvement can be said to have three overlapping aspects. First, ARC has been designated the Atlanta area metropolitan planning organization as required by federal statute and regulation, and RDP is the federally-required systems plan developed according to certain federally-required procedures, so that preparation of the RDP preserves the eligibility for federal funding of all transportation projects included therein. Second, FHWA and UMTA annually reviewed the Atlanta area planning process during the period in question and certified that it was in compliance with federal regulations. And third, ARC received over $4 million in funds for use in carrying out its planning functions, including the development of the RDP.
 
 
 48
 This summary makes plain that, prior to the submission of individual projects to FHWA and UMTA, the only actual federal agency action was 3C certification and funding of the planning process. We think that neither of these actions in and of themselves amounts to "major Federal actions significantly affecting the human environment." The federal decisions involved whether to certify and whether to fund do not entail the exercise of significant discretion. Certification is merely a method of assuring that Part 450 is being complied with I. e., that the planning process is being conducted according to prescribed procedures. Compare NAACP v. Medical Center, Inc., 3 Cir., 1978, 584 F.2d 619.[16] Funding decisions involve, if anything, even less discretion. For example, § 104(f) of the Federal Aid Highways Act sets forth both a fairly rigid formula for computing the amount of funds available and a method of apportioning those funds among the states. More important perhaps, the environmental effect of the decisions is somewhat removed, if they can be said to have any impact at all.
 
 
 49
 The plaintiff's principal argument, however, is not that the federal certification or funding decisions are themselves major federal actions significantly affecting the human environment. Rather, they seek to impress upon us the "federalism" of urban transportation planning and programming. At one point in their brief they describe the location of responsibility for developing transportation system plans with the local MPOs as involving "Congressional delegation of planning functions." At another point, they say that the RDP "is a tool for Federal decision-making throughout the long, complicated planning and project implementation process" and "represents the factual predicate for a series of significant Federal decisions which will affect the quality of the human environment in the Atlanta area." The argument that emerges seems to be that, owing to the modern-day realities of highway and mass-transit construction, I. e., the necessity for federal funding, the federal presence in urban transportation planning and development has become so pervasive that what might ordinarily be viewed as state or local action is in fact federal action. Hence, it is argued, RDP's development and adoption by ARC amounts to "major federal action" within the meaning of § 102(2)(C) in other words, the RDP is in essence a "federal plan".[17]
 
 
 50
 We disagree. Admittedly, much of what plaintiffs say is true, at least as a factual matter for example, that but for federal requirements, RDP would not exist in its present form and perhaps would not exist at all. And we do not quarrel with the proposition that federal involvement can in some circumstances be so massive, so pervasive, that "the acts of the state are in reality federal actions." Chesapeake Bay Foundation v. Virginia State Water Control Board, E.D.Va., 1978, 453 F.Supp. 122, 125-126. Cf. Port of Astoria v. Hodel, 9 Cir., 1979, 595 F.2d 467; Hawthorn Environmental Preservation Association v. Coleman, N.D.Ga., 1976, 417 F.Supp. 1091, 1101, Aff'd, 5 Cir., 1977, 551 F.2d 1055. We simply do not think that that is the case here: the "federal imprimatur," see Hawthorn, 551 F.2d at 1056, does not attach to state transportation projects at the systems planning stage.
 
 
 51
 The fact is that the RDP was developed by ARC in conjunction with state and local authorities, and no federal agency had any significant hand in determining, or made any decision concerning, its substantive aspects. Under the statutes, those decisions are entrusted to the state and local agencies, not FHWA or UMTA. Moreover, the plan, as a plan, will Never be submitted to a federal agency for review or approval. And while the planning process was structured so as to preserve the eligibility for federal funding of projects included within the resulting plan, it has been consistently held that the possibility of federal funding in the future for a project or group of projects does not make that project or projects "major federal action" during the planning stage. See City of Highland Park v. Train, 7 Cir., 1975, 519 F.2d 681, 693-695, Cert. denied, 1976, 424 U.S. 927, 96 S.Ct. 1141, 47 L.Ed.2d 337; Friends of the Earth, Inc. v. Coleman, 9 Cir., 1975, 518 F.2d 323; City of Boston v. Volpe, 1 Cir., 1972, 464 F.2d 254, 258 ("(T)he adoption of certain federal standards and specifications in the hope of qualifying for federal assistance cannot transform a state or local project into a federal one"). Until the project is presented to the appropriate federal agency, "the only relevant decision makers . . . are local officials." Friends of the Earth, supra, 518 F.2d at 329.
 
 
 52
 The plaintiffs place much emphasis on the use of federal funds in the planning process. Determining whether a program is sufficiently "federal" to render it subject to NEPA will often entail analysis of the amount and significance of federal aid.[18] And in some circumstances, perhaps, the federal character of a state or local project can be established merely by the presence of substantial federal assistance. Cf. Ely v. Velde, 4 Cir., 1974,497 F.2d 252. But we think the presence of federal financial assistance is generally just one factor in the analysis of whether there is sufficient federal control over, responsibility for, or involvement with an action to require preparation of an EIS. Cf. NAACP v. Medical Center, Inc., 3 Cir., 1978, 584 F.2d 619, 634. Here, the availability of federal funds for the planning process apparently is not in any way tied to any sort of substantive review of the plans produced by that process. Moreover, federal financial assistance to the planning process in no way implies a commitment by any federal agency to fund any transportation project or projects or to undertake, fund, or approve any action that directly affects the human environment. Compare Ely v. Velde, supra. We therefore do not think that the fact of federal financial assistance to the planning process significantly alters the analysis. See James River & Kanawha Canal v. Richmond Metropolitan Authority, E.D.Va., 1973, 359 F.Supp. 611, 634, 636 n.72, Aff'd., 4 Cir., 1974, 481 F.2d 1280; Hill v. Coleman, D.Del., 1975, 399 F.Supp. 194, 202.
 
 
 53
 In sum, we reject the plaintiffs' argument that adoption of the RDP constituted "major federal action significantly affecting the human environment" within the meaning of § 102(2)(C) of NEPA. Plans for development, whether of local, regional, or national scope, may well constitute a recommendation or report on a proposal for action. But where, as here, state and local agencies are solely responsible for the contents of the plan, the projects proposed, and the improvements recommended, and the adoption of the plan in no way obligates the federal government, the plan cannot be said to be "federal" for the purposes of NEPA.[19]VI
 
 
 54
 In their motion for a preliminary injunction filed shortly after adoption of the RDP, the plaintiffs alleged that certain projects contemplated by and included within the RDP were being developed and that a draft EIS was being circulated on one of those projects, the I-85 widening. The motion sought to restrain GaDOT and USDOT from further implementation of the I-85 or other projects until preparation of an EIS on the entire RDP. We think that the District Judge erred in rejecting this motion out of hand as raising issues outside the scope of the complaint. Insofar as the motion constitutes a challenge, not to a particular impact statement, but to the defendants' decision not to prepare a comprehensive impact statement on the RDP at the time USDOT approves a proposed project included within the RDP, we think that the issues raised are intimately related to those raised by the original complaint and that the District Judge should have passed on their merits. See Kleppe v. Sierra Club, supra, 427 U.S. at 408-409, 96 S.Ct. at 2729-2730, 49 L.Ed.2d at 589-590. Because the facts are undisputed, however, we see no need for a remand.
 
 
 55
 The plaintiffs' contention is similar indeed, in our view, it is indistinguishable from that considered by the Supreme Court in Part V of Kleppe : that, even without a "comprehensive federal plan," a regional EIS is nevertheless required on all transportation-related projects included within the RDP because they are "intimately related." 427 U.S. at 408, 96 S.Ct. at 2729, 49 L.Ed.2d at 589. In other words, USDOT must consider the environmental impact of all projects in the entire RDP before it can grant approval for the location, design, etc.,[20] of any individual project.
 
 
 56
 Under this theory, "federal action" presents no hurdle it is undisputed that at some point FHWA and UMTA action in approving an individual project becomes a "major federal action significantly affecting the human environment" and requires an impact statement of some sort. However, the argument fails for another reason. Although the Kleppe Court accepted in part the thesis that proposed actions with "cumulative or synergistic" effects may require a comprehensive EIS, it added the qualification that an agency need not "consider the possible environmental impacts of less imminent actions when preparing the impact statement on proposed actions." Id. at 410 n.20, 96 S.Ct. at 2730, 49 L.Ed.2d at 590. Since it is clear that many, if not most, of the individual transportation projects included in the RDP are not "proposed" federal actions some will not ever be implemented, others not for another ten or twenty years but are, at best, "contemplated" actions, the impact statement prepared on proposed projects approved by FHWA and UMTA need not address the environmental impact of the entire RDP.[21]
 
 VII
 
 57
 We have no doubt but that the RDP embodies important decisions concerning the future growth of the Atlanta area that will have a continuing and significant effect on the human environment. But at the risk of belaboring the point, we reemphasize that those decisions have been made by state and local authorities, will not be reviewed by any federal agency, and obligate no federal funds. The defendants therefore need not prepare an impact statement on the RDP.
 
 
 58
 AFFIRMED.
 
 
 
 *
 District Judge from the Northern District of Illinois, sitting by designation
 
 
 [1]
 For the convenience of the reader, we list below the acronyms most often used in this opinion:
 ARC Atlanta Regional Commission
 GaDOT Georgia Department of
 Transportation
 MARTA Metropolitan Atlanta Rapid Transit
 Authority
 USDOT United States Department of
 Transportation
 RDP Regional Development Plan
 NEPA National Environmental Policy Act
 of 1969
 EIS Environmental impact statement
 ACTC Atlanta Coalition on the
 Transportation Crisis
 FHWA Federal Highway Administration
 UMTA Urban Mass Transit Administration
 MPO Metropolitan Planning Organization
 TIP Transportation Improvements
 Program
 CEQ Council on Environmental Quality
 
 
 [2]
 We deal here only with "systems" planning, as opposed to "project" planning. As explained by the Director of Planning and Programming for GaDOT, systems planning "is a broad look at the anticipated transportation needs of a wide area. It can be termed a corridor level analysis in that as the needs are identified, general corridors, rather than particular facilities, which can be used to meet those needs are also identified." Project planning, on the other hand, "is that stage at which specific solutions to the needs identified at the system planning stage are found."
 As defined in 23 CFR § 795.2, systems planning involves "regional analysis of transportation needs and the identification of transportation corridors." See description of the RDP, Part III, Infra.
 
 
 [3]
 S 134. Transportation planning in certain urban areas
 (a) It is declared to be in the national interest to encourage and promote the development of transportation systems embracing various modes of transportation in a manner that will serve the States and local communities efficiently and effectively. To accomplish this objective, the Secretary shall cooperate with the State and local officials in the development of transportation plans and programs which are formulated on the basis of transportation needs with due consideration to comprehensive long-range land use plans, development objectives, and overall social, economic, environmental, system performance, and energy conservation goals and objectives, and with due consideration to their probable effect on the future development of urban areas of more than fifty thousand population. The planning process shall include an analysis of alternative transportation system management and investment strategies to make more efficient use of existing transportation facilities. The process shall consider all modes of transportation and shall be continuing, cooperative, and comprehensive to the degree appropriate based on the complexity of the transportation problems. After July 1, 1965, the Secretary shall not approve under section 105 of this title any program for projects in any urban area of more than fifty thousand population unless he finds that such projects are based on a continuing comprehensive transportation planning process carried on cooperatively by States and local communities in conformance with the objectives stated in this section. No highway project may be constructed in any urban area of fifty thousand population or more unless the responsible public officials of such urban area in which the project is located have been consulted and their views considered with respect to the corridor, the location, and design of the project.
 
 
 [4]
 S 1607. Long-range planning and technical studies
 Developmnt of transportation plans and programs; matters considered
 (a) It is declared to be in the national interest to encourage and promote the development of transportation systems embracing various modes of transportation in a manner that will serve the States and local communities efficiently and effectively. To accomplish this objective, the Secretary shall cooperate with the State and local officials in the development of transportation plans and programs which are formulated on the basis of transportation needs with due consideration to comprehensive long-range land use plans, development objectives, and overall social, economic, environmental, system performance, and energy conservation goals and objectives, and with due consideration to their probable effect on the future development of urban areas of more than fifty thousand population. The planning process shall include an analysis of alternative transportation system management and investment strategies to make more efficient use of existing transportation facilities. The process shall consider all modes of transportation and shall be continuing cooperative, and comprehensive to the degree appropriate based on the complexity of the transportation problems.
 Approval of program of projects by Secretary
 (c) A program of projects eligible for assistance under this chapter shall be submitted for approval to the Secretary. The Secretary shall not approve for an urbanized area any such program of projects in whole or in part unless (1) the Secretary finds that the planning process on which such program is based is being carried on in conformance with the objectives of this section, and (2) the Secretary finds that the program of projects is based on the planning process.
 
 
 [5]
 The prospectus "shall establish a multiyear framework within which the unified planning work program is accomplished," 23 CFR § 450.114(b), and the unified planning work program "shall (1) Annually describe all urban transportation and transportation-related activities anticipated within the area during the next 1- or 2-year period regardless of funding sources; and (2) Document work to be performed with planning assistance provided under" the UMTA and FHWA. Id. § 450.114(c)
 
 
 [6]
 S 450.116 Urban transportation planning process: transportation plan
 (a) The urban transportation planning process shall include the development of a transportation plan consisting of a transportation systems management element and a long-range element. The transportation plan shall be reviewed annually to confirm its validity and its consistency with current transportation and land use conditions.
 (b) The transportation systems management element of the transportation plan shall:
 (1) Provide for the short-range transportation needs of the urbanized area by making efficient use of existing transportation resources and providing for the movement of people in an efficient manner; and
 (2) Identify traffic engineering, public transportation, regulatory, pricing, management, operational, and other improvements to the existing urban transportation system not including new transportation facilities or major changes in existing facilities.
 (c) The long-range element of the transportation plan shall:
 (1) Provide for the long-range transportation needs of the urbanized area; and
 (2) Identify new transportation policies and transportation facilities or major changes in existing facilities by location and modes to be implemented.
 (d) The transportation plan shall be consistent with the area's comprehensive long-range land use plan, urban development objectives, and the area's overall social, economic, environmental, system performance, and energy conservation goals and objectives.
 
 
 [7]
 S 450.118 Urban transportation planning process: transportation improvement program
 (a) The urban transportation planning process shall include development of a transportation improvement program including an annual element as prescribed in Subpart C of this part.
 (b) The program shall be a staged multiyear program of transportation improvement projects consistent with the transportation plan developed under § 450.116 of this subpart.
 
 
 [8]
 S 450.122 Urban transportation planning process: certification
 (a) The Federal Highway and Urban Mass Transportation Administrators jointly will review and evaluate annually the transportation planning process in each urbanized area to determine if the process meets the requirements of this subpart.
 (b) If, upon the review and evaluation conducted under paragraph (a) of this section, the Administrators jointly determine that the transportation planning process in an urbanized area meets or substantially meets the requirements of this subpart, they may take one of the following actions, as appropriate:
 (1) Certify the transportation planning process; or
 (2) Certify the transportation planning process subject to one of the following conditions:
 (i) That certain specified corrective actions be taken; or
 (ii) That the process is a basis for approval of only those categories of programs or projects that the Administrators may jointly determine and that certain specified corrective actions be taken.
 (c) The State and the MPO shall be notified of the actions taken under paragraph (b) of this section.
 (d) A certification under paragraph (b) of this section will remain in effect until a new certification determination is made.
 
 
 [9]
 E. g., for federal-aid highways, FHWA designation as part of one of the Federal Aid Highways Systems, 23 U.S.C.A. § 103; FHWA location and design approval, 23 U.S.C.A. § 128, 23 CFR Part 790.9; FHWA plans, specifications and estimates approval, 23 U.S.C.A. § 106, 23 CFR Part 630, subpart B
 
 
 [10]
 The process was "conditionally certified" in 1972, 1973, and 1974. The conditions imposed related to ARC's undertaking certain improvements in the planning process
 
 
 [11]
 That EIS, prepared in 1971 and 1972, has survived court challenge. See Save Our Sycamore, Inc. v. MARTA, 5 Cir., 1978, 576 F.2d 573
 
 
 [12]
 We need not and do not decide whether, under Kleppe, an EIS would be required had the RDP (or something very like it) been prepared by a federal agency. We have some doubt whether the RDP is sufficiently definite to constitute a "proposal for action." See Indian Lookout Alliance v. Volpe, 8 Cir., 1973, 484 F.2d 11, 19, Quoted with approval in Sierra Club v. Callaway, 5 Cir., 1974, 499 F.2d 982, 987; Swain v. Brinegar, 7 Cir., en banc, 1976, 542 F.2d 364, 369 ("On the other hand, an EIS need not consider the long-term visions of highway designers and urban engineers when they suggest comprehensive plans which may take years to construct, if they are to be built at all. The information contained in an EIS for such a comprehensive plan is likely to be speculative, irrelevant to the specific question before the decision-maker, and outdated by the time the choice must be made"). Compare Port of Astoria v. Hodel, 9 Cir., 1979, 595 F.2d 467; Scientists' Institute for Public Information, Inc. v. AEC, 1973, 156 U.S.App.D.C. 395, 481 F.2d 1079. See also § 1508.18(b)(2) of the new CEQ regulations and P 7(g) of the proposed USDOT regulations, both of which are quoted and discussed in note 19, Infra
 
 
 [13]
 While impact statements may serve other purposes as well E. g., informing the public and the Congress of the environmental consequences of and alternatives to agency actions, thus fostering informed debate and strengthening agency accountability the informative purpose was the principal motivating force underlying the enactment of NEPA
 
 
 [14]
 As stated in Andrus v. Sierra Club, --- U.S. ----, 99 S.Ct. 2335, 60 L.Ed.2d 943 (1979):
 The thrust of § 102(2)(C) is thus that environmental concerns be integrated into the very process of agency decision-making. The "detailed statement" it requires is the outward sign that environmental values and consequences have been considered during the planning stage of agency actions.
 Id. at ----, 99 S.Ct. at 2337, 60 L.Ed.2d at 947.
 
 
 [15]
 See McGarity, supra, 55 Tex.L.Rev. at 803. At last count, § 102(2)(C) had in its short ten-year history inspired some 203 pages of citations in the bound volume of U.S.C.A., with some 37 more in the pocket part
 
 
 [16]
 The issue in Medical Center was whether the action of HEW in approving a capital expenditure by a private non-profit hospital constituted major federal action for purposes of NEPA. The hospital had sought approval of its relocation plans pursuant to § 1122 of the Social Security Act, 42 U.S.C.A. § 1320a-1. Under that section, one purpose of which is to encourage health planning by the state, the state must designate an agency to administer applications for capital expenditure approval. The agency is required to determine if the capital expenditure is consistent with the need for adequate health care in the area. If it concludes that it is, the agency sends on its findings to the Secretary of HEW, who "then performs the ministerial act of assuring that the proper procedure has been followed. . . .. The Secretary, however, has no discretion as to whether the proposed expenditures are unwise." 584 F.2d at 628, Quoting the District Court's opinion below, 436 F.Supp. 1194, 1198. The effect of § 1122 approval is an HEW commitment not to withhold the capital cost as a component of patient reimbursements under the medicare, medicaid, and child health programs. Affirming the District Court, the Third Circuit relied on the following circumstances in holding that an EIS was not required because the action of HEW did not demonstrate a "federal 'responsibility' " for the action: HEW's decision to issue a § 1122 approval involves no "discretion" to consider environmental consequences; a § 1122 approval does not require the federal government to expend any funds on the hospital project; and § 1122 approval is not a "legal precondition" to action that is, a legally necessary approval Required before a private party may act. So too with 3C certification: FHWA and UMTA's certification of the planning process involves no consideration of the substantive aspects of the plans and thus does not take into account environmental factors; certification merely preserves eligibility for federal funding, it does not guarantee it; and 3C certification is not a legal precondition to action
 
 
 [17]
 The plaintiffs at times seem to be advancing a different but closely related argument, which, though little more than a variation on a theme, deserves comment. Although ARC's development and adoption of the RDP may not be major federal action, the argument goes, the RDP is still a "recommendation or report" on a proposal for major federal action because the projects included therein will in all likelihood be funded in part by FHWA and UMTA and thus become federal projects. This argument, however, is foreclosed by the Supreme Court's decision in SCRAP II, supra. There the Court rejected a three-judge district court's holding that the ICC should have had available a "final draft impact statement" when it held oral hearings in the spring and summer of 1972 on the railroads' filing of a general rate increase. The ICC issued a report on October 4, 1972 based in part on these hearings in which it in effect approved the railroads' request for increase. The Court held that NEPA required, at the most, that an impact statement accompany the October report:
 NEPA provides that "such statement . . . shall accompany The proposal through the existing agency review processes" (emphasis added). This sentence does not, contrary to the District Court opinion, affect the time when the "statement" must be prepared. It simply says what must be done with the "statement" once it is prepared it must accompany the "proposal." The "statement" referred to is the one required to be included "in every recommendation or report on proposals for . . . major federal action significantly affecting the quality of the human environment" and is apparently the final impact statement, for no other kind of statement is mentioned in the statute. Under This sentence of the statute, the time at which the agency must prepare the final "statement" is the time at which it makes a recommendation or report on a Proposal for federal action. Where an agency initiates federal action by publishing a proposal and then holding hearings on the proposal, the statute would appear to require an impact statement to be included in the proposal and to be considered at the hearing. Here, however, until the October 4, 1972, report, the ICC had made no proposal, recommendation, or report. The only proposal was the proposed new rate filed by the railroads. Thus, the earliest time at which the Statute required a statement was the time of the ICC's report of October 4, 1972 sometime after the oral hearing.
 422 U.S. at 320-321, 95 S.Ct. at 2356, 45 L.Ed.2d at 215-216. In other words, an impact statement must be prepared at the time at which the federal Agency prepares a report or recommendation on a proposal for federal action. Even though the railroads planned to, and did, submit their rate proposal for approval to the ICC, there was no suggestion that the Railroads need prepare an impact statement on the proposal. ARC in this case stands in the same position as the railroads in SCRAP II, yet another step removed: the RDP will never be submitted for approval and action to a federal agency. See Conservation Society of Southern Vermont v. Secretary of Transportation, 2 Cir., 1974, 508 F.2d 927, Vacated and remanded, 1975, 423 U.S. 809, 93 S.Ct. 19, 46 L.Ed.2d 29, On remand, 2 Cir., 1976, 531 F.2d 637. There the Supreme Court vacated and remanded for reconsideration in light of SCRAP II the Second Circuit's initial decision which had held in part that an EIS need be prepared on a 280-mile stretch of highway through Connecticut, Massachusetts, and Vermont. On remand, the Second Circuit held:
 We also affirmed (in the prior decision) the holding of the district court that an EIS be prepared for the entire 280-mile length of route 7 even though no plan then existed for constructing the superhighway through Connecticut, Massachusetts, and Vermont. 508 F.2d at 934-36. The Supreme Court remand here cites SCRAP, supra, which holds that a federal agency must prepare its EIS at "the time at which it makes a recommendation or report on a Proposal for federal action." 422 U.S. at 320, 95 S.Ct. at 2356, 45 L.Ed.2d 215 (emphasis in original). Here the findings of the district court were that, although federal officials had knowledge of the overall planning process of state officials, there was "no overall federal plan" for improving the corridor into a superhighway. 362 F.Supp. at 636. The federal action being taken here relates only to the 20-mile stretch between Bennington and Manchester and Vermont. This stretch is "admittedly a project with local utility," 508 F.2d at 935. Hence, we see no irreversible or irretrievable commitment of federal funds for the entire corridor and under SCRAP no obligation for a corridor EIS.
 531 F.2d at 639-640.
 Similarly, the RDP is not a "federal" plan, and it is not enough to trigger NEPA that proposal projects included within the plan will be federal projects when and if implemented.
 
 
 [18]
 This is a different question, of course, than whether a federal decision to make funds available is itself major federal action significantly affecting the human environment, see text, Supra, following note 16, but one which is obviously related
 
 
 [19]
 Pursuant to Presidential directive, the Council on Environmental Quality (CEQ) recently issued regulations to Implement the procedural provisions of NEPA. 43 Fed.Reg. 55978-56007 (1978), to be codified at 40 CFR Part 1500. The effective date of these regulations is July 30, 1979, and they are binding on all federal agencies. The Supreme Court has recently held that the CEQ regulations are entitled to "substantial deference." Andrus v. Sierra Club, --- U.S. ----, 99 S.Ct. 2335, 60 L.Ed.2d 943 (1979)
 Our conclusion that ARC's development and adoption of the RDP is not "major federal action" is consistent with the CEQ regulations. Major federal action is defined in § 1508.18 as including "actions with effects that may be major and which are potentially subject to Federal control and responsibility." The emphasis on "Federal control and responsibility" accords with our analysis. Similarly, § 1508.18(b) describes as one of the categories of typical federal actions:
 (2) Adoption of formal plans, such as official documents prepared or approved by federal agencies which guide or prescribe alternative uses of federal resources, upon which future agency actions will be based.
 Here, of course, the RDP was neither prepared by nor approved by a federal agency.
 It is true that CEQ deliberately avoided expressing an opinion on "NEPA's application to Federal programs which are delegated or otherwise transferred to state and local government" for the reason that the issue is "highly complicated." See Comments on § 1508.17, 43 Fed.Reg. 55989. We have considerable doubt that this caveat is applicable here, however, because urban transportation systems planning is not a "federal program which (has been) delegated or otherwise transferred" to local MPOs, at least in the usual sense in which those terms are used.
 Finally, we think our holding consistent with the recently published proposed regulations of USDOT regarding the preparation of impact statements. 44 Fed.Reg. 31341 (May 31, 1979). P 7(g) provides:
 g. Tiering. Tiering of EISs as discussed in CEQ 1502.20 should be used when it will improve or simplify the environmental processing of proposed DOT actions. Preparation of EISs or environmental assessments for Federal decisions on regional transportation plans and transportation systems (e. g. approval of a fixed guideway transit system or approval of an airport master plan or layout plan) is encouraged. A broad scale EIS or environmental assessment should also be considered where a number of discreet but related actions to implement a plan or program (such as a regional freeway system) are anticipated, even though formal Federal approval of the plan or program may not be required. These broad EISs/environmental assessments should focus on issues such as modal choice alternatives, air quality and land use implications of alternative transportation systems or plans. EISs or environmental assessments on these plans should utilize information from studies performed as a part of any regional transportation planning process, such as that conducted under Section 134 of the Federal Aid Highway Act. System EISs would normally be appropriate only in conjunction with new or major revisions of plans or programs, not for annual adjustments or revisions.
 As we read this proposed regulation, it does not require preparation of an EIS on regional plans where there is no federal approval of the plan, though it encourages (E. g., "should be considered") their preparation or the preparation of "environmental assessments" where the agency will be called upon to take action concerning individual but related projects included within the plan. Cf. Part VI, Infra.
 
 
 [20]
 See note 9, Supra
 
 
 [21]
 No question of the required scope of the impact statement on any particular project or group of projects is before us. We hold Only that NEPA does not require an EIS on the entire RDP. The issues of what constitutes a "project" and the extent to which particular transportation projects are sufficiently related as to require preparation of a comprehensive impact statement raise difficult issues that have been the subject of much litigation. See, e. g., Named Individual Members of the San Antonio Conservation Society v. Texas Highway Dept., 5 Cir., 1971, 446 F.2d 1013; Swain v. Brinegar, 7 Cir., 1976, 542 F.2d 364; Indian Lookout Alliance v. Volpe, 8 Cir., 1973, 484 F.2d 11, 19; Trout Unlimited v. Morton, 9 Cir., 1974, 509 F.2d 1276