Ann **BRADLEY**, Abraham J. Marcus, John Stanton and Joe Kantor, Etc., Plaintiffs-Appellants,

v.

The **UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, et al., Defendants-Appellees.**

No. 78–3596.

United States Court of Appeals, Fifth Circuit.*

Oct. 5, 1981.

* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.

Legal Services of Greater Miami, Inc., Peter M. Siegel, Larry A. Baker, Miami, Fla., for plaintiffs-appellants.

Ronald R. Glancz, Susan A. Ehrlich, Civ. Div., Appellate Staff, Dept. of Justice, Washington, D. C., for defendants-appellees.

Thomas Martin Pflaum, Miami Beach, Fla., for City of Miami Beach.

Before HILL and POLITZ, Circuit Judges, and O'KELLEY **, District Judge.

O'KELLEY, District Judge:

Ann Bradley and three other residents of the City of Miami Beach, Florida,[1] instituted this action against the Department of Housing and Urban Development[2] (hereinafter "HUD") and the City of Miami Beach, Florida,[3] seeking declaratory and injunctive relief to prevent the continued use of Title I Block Grant Funds obtained pursuant to the Housing and Community Development Act of 1974, 42 U.S.C. § 5301 *et seq.* (1976) (hereinafter "HCDA")[4] until such time as the defendants complied with the HCDA and the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.* (1976) (hereinafter "NEPA"). In their complaint, the plaintiffs alleged that the City misused Title I Block Grant Funds and failed to prepare an Environmental Impact Statement (hereinafter "EIS") for the South Beach Redevelopment Project as required by NEPA; the plaintiffs also alleged that the federal defendants acted illegally in failing to ensure that the City complied with HCDA and NEPA. The district court entered summary judgment in favor of the defendants, dismissing the plaintiffs' NEPA claims as premature and holding that the disbursements of block grant funds by HUD and the use of those disbursements by the City were not in violation of HCDA. We affirm.

** District Judge of the Northern District of Georgia, sitting by designation.

1. Ann Bradley, Abraham J. Marcus, John Stanton, and Joe Kantor filed suit on behalf of themselves and all others similarly situated; however, the district court denied the plaintiffs' motion to certify a class and the plaintiffs prosecuted the suit in their individual capacities. For ease of reference, the court will collectively refer to the plaintiffs-appellants as "Bradley."

2. The plaintiffs also sued Patricia Harris, as the incumbent Secretary of HUD, and Robert W. Buskirk, as the Director of the Jacksonville Area HUD office. For ease of reference, the court will refer to all of the federal defendants as "HUD."

3. In addition to the City of Miami Beach, Bradley sued Dodd A. Southern, the City Manager, Harold Rosen, the Mayor, and Philip Sahl, Dr. Leonard Haber, Dr. Simon Wikler, Leonard Weinstein, Murray Meyerson, and Hal Spaet, Jr., members of the City Council. For ease of

reference, the court will refer to the city defendants-appellees as "City" or "Miami Beach."

4. The HCDA has been amended several times since its enactment in 1974: Pub.L. 94–375, § 15, 90 Stat. 1076 (August 3, 1976); Pub.L. 95–24, Title I, § 103, 91 Stat. 55 (April 30, 1977); Pub.L. 95–128, Title I, § 101–110, Title II, §§ 203, 207, Title IX, § 902, 91 Stat. 1111–1127, 1129, 1130 (October 12, 1977); Pub.L. 95–577, Title I, §§ 102, 103, Title III, § 319, 92 Stat. 2083, 2084, 2101 (October 31, 1978); Pub.L. 96–153, Title I, §§ 103–106, 109(a), Title II, § 204, 93 Stat. 1101–1105, 1108 (Dec. 21, 1979); Pub.L. 96–399, Title I, §§ 101–105(a), 106–112, 116, 117, 94 Stat. 1614–1622 (October 8, 1980). The amendments are not applicable to the present action, however, because HUD approved the City's 1975 and 1976 requests for block grant funds prior to any amendments to the Act. All references to the HCDA therefore will be to the original Act prior to amendment.

The City of Miami Beach began its redevelopment activity for what is commonly known as the South Beach area in September of 1973 when it adopted a resolution establishing a building moratorium for purposes of planning redevelopment for the area. The City first applied to HUD for funds under the HCDA in April of 1975. As required by Title I of the Act, the City's application contained a statement of the City's needs and objectives, including rehabilitating the area's housing stock, preventing and eliminating blighting influences, and increasing the diversity, vitality, and economic productivity of the area. The City's application requested funding for both housing rehabilitation and redevelopment planning. In May of 1975, HUD approved the City's request for the amount of $564,000.00, $50,000.00 of which was earmarked for redevelopment planning, subject to the condition that the City comply with all environmental review requirements contained in HUD regulations. HUD regulations specifically exempt planning funds from environmental review requirements, 24 C.F.R. § 570.603, 58.21(a)(2), and the City complied with the environmental review requirements for the non-exempt funds by publishing a notice in a newspaper of general circulation of its intent not to file an EIS and, after receiving no public comments, by publishing its intent to request release of the block grant funds. HUD thereafter released the funds upon a finding that the City complied with its environmental regulations.

The City's second application for block grant funds was submitted to HUD in March of 1976. Rehabilitation of housing and elimination of urban blight remained among the City's stated needs and objectives. The City requested and received funds to implement the City's objectives, including $250,000.00 allocated for redevelopment planning. As in 1975, a condition of obtaining the funds was to comply with HUD's environmental regulations. In May of 1976, the City published a notice that it

did not intend to prepare an EIS, and, after no objections or public comments were received, the City published notice of its intent to request release of the funds. Receiving no objections, HUD released the funds upon a finding that the City had fulfilled HUD's environmental requirements.

Approximately $300,000.00 of the $1,817,000.00 allocated to the City in block grant funds for the years 1975 and 1976 was originally earmarked for redevelopment planning. However, pursuant to HUD regulations, the City transferred funds from other approved program activities to redevelopment planning, resulting in the eventual allocation of $1,440,000.00 for redevelopment planning. Consequently, in the first two program years, very little money was available to expend on any activities other than redevelopment planning or administration. On February 17, 1976, the City created the Miami Beach Redevelopment Agency. Utilizing block grant funds, the agency prepared a comprehensive and highly specific plan for the redevelopment of the South Beach area. The City approved and adopted the plan on March 2, 1977 by passing an ordinance designating it as the City's official redevelopment plan. At the time of the district court decision, the redevelopment agency was seeking funding to implement the plan; however, it was not contemplated that any of the actual development would definitely be financed through the use of federal money.[5]

After each program year HUD prepared a monitoring report of the City's program activities and found no deficiencies or problem areas, although it advised the City after the first program year to expedite its rehabilitation effort. In the City's grantee performance report, the City informed HUD that it had amended its budget to allocate additional funds to redevelopment planning. The City provided HUD with a breakdown of the amendments and a copy of the resolutions authorizing the amend-

---

5. While various individual projects within the development area were receiving federal funds for their implementation, they were all under-

way prior to the adoption of the redevelopment plan.

ments. Because a grantee is permitted by HUD regulations to transfer block grant funds from one previously approved use to another previously approved use without prior HUD approval, HUD took no action against the City with regard to the transfers.

There are two issues presented by this appeal. The first is whether the creation and approval of the South Beach Redevelopment Project constituted a proposal for major federal action significantly affecting the quality of the human environment so as to require the preparation of an EIS at that stage of the planning process. The second is whether there is a genuine issue of material fact with respect to the legality of the City's use of Title I block grant funds.

## I

The first issue is substantially similar to the issue decided by this court in *Atlanta Coalition on the Transportation Crisis, Inc. v. Atlanta Regional Commission*, 599 F.2d 1333 (5th Cir. 1979) (hereinafter "*ACTC v. ARC*"). In that case the plaintiffs argued that the defendants were required to prepare an EIS for a regional development plan (hereinafter "RDP") providing long-range transportation and land use planning for the Atlanta area. We summarized the federal involvement in the RDP as follows:

> First, ARC has been designated the Atlanta area metropolitan planning organization as required by federal statute and regulation, and RDP is the federally-required systems plan developed according to certain federally-required procedures, so that preparation of the RDP preserves the eligibility for federal funding of all transportation projects included therein. Second, FHWA and UMTA annually reviewed the Atlanta area planning process during the period in question and certified that it was in compliance with federal regulations. And third, ARC received over $4 million in funds for use in carrying out its planning functions, including the development of the RDP.

*Id.* at 1344.

This court concluded in *ACTC v. ARC* that the only federal action prior to the submission of individual projects to the appropriate federal agencies for approval was certification that the planning process was being conducted according to prescribed procedures and funding of the planning process. We noted that neither of these actions in and of themselves constituted major federal actions significantly affecting the human environment and went on to rule that certification and funding of the planning process did not convert the development and adoption of the RDP into a "major federal action" within the meaning of NEPA. The court was persuaded by the fact that no federal agency had any significant hand in determining, or made any decision concerning, its substantive aspects. We were also swayed by the fact that federal financial assistance in the planning process in no way implied a commitment by any federal agency to fund any project developed thereby.

In the present action, there is less federal control over or responsibility for the development of the South Beach Redevelopment Project than was present in the development of the RDP in *ACTC v. ARC*. Title I of the HCDA consolidated ten grant-in-aid programs into a single block grant program and streamlined the procedure for obtaining federal aid in order to ensure rapid processing and minimize HUD's front-end review of the development plans submitted to it for approval. As long as an application complied with section 104 of the Act, HUD was *required* to approve it in an amount not exceeding the amount allowed by section 106 of the Act, unless

> (1) on the basis of significant facts and data, generally available and pertaining to community and housing needs and objectives, the Secretary determines that the applicant's description of such needs and objectives is plainly inconsistent with such facts or data; or

> (2) on the basis of the application, the Secretary determines that the activities to be undertaken are plainly inappropriate to meeting the needs and objectives

identified by the applicant pursuant to subsection (a) of this section; or

(3) the Secretary determines that the application does not comply with the requirements of this chapter or other applicable law or proposes activities which are ineligible under this chapter.

42 U.S.C. § 5304(c).

If HUD took no action on an application within seventy-five days of its receipt, it was automatically approved. Grantees under the Act were required to submit annual performance reports to HUD detailing their activities under the Act together with an assessment of the relationship of those activities to the objectives of the Act and the needs and objectives identified in their application. In addition, HUD was required to conduct at least an annual review to determine whether the grantee carried out its program substantially as described in the application, whether the program conformed to the statutory and regulatory requirements, and whether the grantee had the capacity to continue the program. 42 U.S.C. § 5304(d). Thus, the Act placed the primary responsibility for determining local needs and establishing priorities on the applicant. As in *ACTC v. ARC*, the only federal actions prior to actual implementation of projects contained in the development plan were funding the planning process and certifying that the grantee followed the proper procedures in obtaining and expending the funds used to develop the plan. Again, as in *ACTC v. ARC*, the federal agency granting the funds did not have a significant hand in determining the substantive aspects of the development plan, and federal financial assistance in the planning process did not imply a commitment by any federal agency to fund any project developed thereby. In *ACTC v. ARC*, there was additional federal involvement that is not present in the instant action: the designation of a planning agency was required by the federal statute, and the grantee was required to develop the plan in accordance with federal procedures if it wanted to preserve its eligibility for federal funding for projects contained therein. Here, the HCDA did not specify that a planning agency need be created or that any plan developed with block grant funds comply with federal regulations in order to preserve the grantee's eligibility for federal funding for projects contained therein. The federal government had absolutely *no* substantive control over the contents of the plan. We therefore conclude that the mere creation of the plan with federal funds pursuant to a federal block grant program does not in and of itself convert the creation and adoption of the South Beach Redevelopment Project into a "major federal action" within the meaning of NEPA.

II

█ The plaintiffs contend that there are genuine issues of material fact concerning whether the transfer of funds from housing rehabilitation to redevelopment planning violated the HCDA. While they concede that HUD regulations allow transfer of funds from one previously approved program activity to another, the plaintiffs argue that such a transfer is illegal if the activities undertaken (1) are inconsistent with the stated needs and objectives contained in the application for block grant funds or (2) violate the primary purpose behind the Act: benefiting persons of low and moderate income. The defendants counter that there is no genuine dispute over the material facts of this case and that the trial court was correct in granting them summary judgment as a matter of law. They argue that redevelopment planning for an area of urban blight is a permissible activity under the Act and that, because the South Beach area is an area of urban blight, the transfer of funds from one permissible activity, housing rehabilitation, to another permissible activity, redevelopment planning, is not inconsistent with the City's application and does not violate the Act.

The court concludes that the district court did not err in granting summary judgment in favor of the defendants as a matter of law. The material facts in this case are not in dispute: the South Beach area in the City of Miami Beach, Florida, has been declared an area of urban blight.

In both the City's 1975 and 1976 applications for block grant funds, it requested funds for rehabilitation of housing and redevelopment planning for the South Beach area. While the City originally earmarked $300,000.00 out of a total of approximately $1,817,000.00 for redevelopment planning, it systematically transferred funds from housing rehabilitation to redevelopment planning so that almost 80% of the block grant funds expended in the first two program years were spent on redevelopment planning. The funds were used to create the South Beach Redevelopment Project which contemplates sweeping changes to the South Beach area and is designed to eliminate urban blight.

Reviewing the above facts, the court concurs with the court below that the City's transfer of funds from rehabilitation of housing to redevelopment planning did not violate either the spirit or the letter of the HCDA. The court also agrees that HUD's failure to challenge the transfers as being in violation of the Act was not arbitrary, capricious, an abuse of administrative discretion, or otherwise not in accordance with law. *See Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). Section 101 of the HCDA defines the primary objective of the Act as the "development of viable urban communities, by providing decent housing and a suitable living environment and expanding economic activities, principally for persons of low and moderate income." 42 U.S.C. § 5301(c).[6] Section 104(b)(2) of Title I requires in part that applicants for funds certify to the satisfaction of the Secretary "that its Community Development Program has been developed so as to give maximum feasible priority to activities which will benefit low- or moderate-income families *or* aid in the prevention or elimination of slums or blight." 42 U.S.C. § 5304(b)(2) (emphasis added). It is clear to the court that the redevelopment planning funds were used to develop a plan to "aid in the prevention or elimination of slums or blight." If the court ruled, as the plaintiffs would have us, that the transfer of funds to redevelopment planning was illegal because it did not benefit persons of low and moderate income as much as would rehabilitation of the area's stock housing, we would be usurping the legislature's role in determining community needs and establishing priorities. Under the HCDA, this legislative responsibility was placed on local officials in order to avoid "unnecessary 'second-guessing by Washington'"[7] in making such determinations. The City's actions were clearly within the contemplation of the Act, and this court will not second guess the City's value judgments in determining its needs and establishing priorities.

---

6. In addition, the HCDA declared several specific objectives of the Act:

"(1) the elimination of slums and blight and the prevention of blighting influences and the deterioration of property and neighborhood and community facilities of importance to the welfare of the community, principally persons of low and moderate income;

"(2) the elimination of conditions which are detrimental to health, safety, and public welfare, through code enforcement, demolition, interim rehabilitation assistance, and related activities;

"(3) the conservation and expansion of the Nation's housing stock in order to provide a decent home and a suitable living environment for all persons, but principally those of low and moderate income;

"(4) the expansion and improvement of the quantity and quality of community services, principally for persons of low and moderate income, which are essential for sound community development and for the development of viable urban communities;

"(5) a more rational utilization of land and other natural resources and the better arrangement of residential, commercial, industrial, recreational, and other needed activity centers;

"(6) the reduction of the isolation of income groups within communities and geographical areas and the promotion of an increase in the diversity and vitality of neighborhoods through the spatial deconcentration of housing opportunities for persons of lower income and the revitalization of deteriorating or deteriorated neighborhoods to attract persons of higher income; and

"(7) the restoration and preservation of properties of special value for historic, architectural, or esthetic reasons."

7. S.Rep.No.93–693, 93d Cong., 2d Sess. 56, *reprinted in* [1974] U.S.Code Cong. & Ad.News 4273, 4325.

The judgment of the district court is AFFIRMED.