THE SOUTH BRONX COALITION FOR CLEAN AIR, INC. d/b/a South Bronx Clean Air Coalition, Business Labor and Community Coalition, Inc., Urban Environmental Alliance, Inc., Cherry Tree Association, Inc. and New York City Environmental Justice Alliance, Plaintiffs,

v.

E. Virgil CONROY as Chairman and President of the Metropolitan Transportation Authority and of the New York City Transit Authority and Manhattan Bronx Surface Transit Operating Authority, and of the Long Island Railroad, Hon.

George Pataki, as Governor of the State of New York, Joseph H. Boardman as Commissioner of the New York State Department of Transportation, the New York State Urban Development Corp., John Cahill as Commissioner, New York State Department of Environmental Conservation, Hon Carol M. Browner as administrator of the United States Environmental Protection Agency, Hon. Rodney Slater as United States Secretary of Transportation, Harlem River Yard Ventures, Inc. the New York Post Company, Inc. and USA Waste, Inc., Defendants.

No. 98 Civ. 4404(AGS).

United States District Court,
S.D. New York.

Sept. 8, 1998.

---

John F. McHugh, Elisa Barnes, McHugh & Sherman, New York City, for Plaintiffs.

Richard G. Leland, Jeffrey L. Braun, Karen Leo, Rosenman & Colin LLP, New York City, Clifford Thau, Squadron, Ellenoff, Plesent & Sheinfeld, LLP, New York City, David Paget, Lemuel M. Srolovic, Sive, Paget & Riesel, P.C., New York City, Frank L. Amoroso, Nixon Hargrave Devans & Doyle LLP, Garden City, NY, Norman Spiegel, Asst. Atty. General of State of New York, New York City, Ramon E. Ryes, Jr., Asst. U.S. Atty., U.S. Attorney's Office, New York City, Anthony P. Semancik, Metropolitan Transportation Authority, Deputy General Counsel, New York City, for Defendants.

## OPINION AND ORDER

SCHWARTZ, District Judge.

This case is before the Court on plaintiffs' motion for a preliminary injunction and de-

fendants' cross-motions to dismiss the complaint.

## BACKGROUND

### I. The Parties

The plaintiffs are:

(1) The South Bronx Coalition for Clean Air, Inc. ("South Bronx Coalition"), a not-for profit corporation owned by residents of the South Bronx;

(2) The Urban Environmental Alliance, a public interest environmental organization;

(3) The Business Labor Community Coalition, a public interest environmental organization;

(4) The Cherry Tree Association, Inc., a public interest environmental organization;

(5) The New York City Environmental Justice Alliance, tax-exempt New York corporation organized "to combat environmental racism through advocacy on behalf of low-income neighborhoods and communities of color."

The defendants are:

(1) New York Post Holdings, Inc. (the "Post");

(2) Harlem River Yard Ventures, Inc. ("HRYV");

(3) Metropolitan Transportation Authority, the New York City Transit Authority, the Manhattan and Bronx Surface Transit Operating Authority, the Long Island Railroad Company, and E. Virgil Conway (collectively "MTA");

(4) Empire State Urban Development Corporation, d/b/a Empire State Development Corporation ("ESDC");

(5) Carol M. Browner, as Administrator of the United States Environmental Protection Agency and Rodney Slater, as Secretary of the United States Department of Transportation (collectively the "Federal defendants");

(6) George Pataki, as Governor of the State of New York, Joseph H. Boardman, as Commissioner of the New York State Department of Transportation, and John Cahill, as Commissioner of the New York State Department of Environmental Conservation (collectively the "State defendants"); and

(7) USA Waste Services of NYC, Inc. ("USA Waste").

### II. The Harlem River Yard

This case arises out of a plan to develop the Harlem River Yard ("the Yard"), a 96–acre facility located in the South Bronx in New York City. The Yard formerly served as a rail yard for the New Haven Railroad, but fell into disuse following the merger of the New Haven and Penn Central railroads in 1972. In 1982, the Yard was acquired by the New York State Department of Transportation ("DOT"), which sought to develop it as a regional rail freight transportation facility. By 1988, the State DOT had abandoned such plans and commissioned a private study to analyze alternatives for development of the Yard. That study recommended private development of the Yard as an "intermodal park," combining rail freight transportation with commercially leased warehousing and ancillary activities, including solid waste transfer facilities. In 1991, after issuing a request for proposals, DOT leased the Yard to defendant HRYV, a private developer, for development of a multi-use industrial facility. In 1993, HRYV submitted a final land use plan to DOT for development of the Yard. That plan provided for, among other things, an intermodal freight terminal comprising 28 acres, a 3,000 ton per day truck to rail solid waste transfer facility on five acres, a paper recycling plant and substantial warehousing. The plan was the subject of a Final Environmental Impact Statement ("FEIS") prepared by an outside environmental consultant for HRYV that was submitted to DOT in December 1993 and approved in May 1994. The FEIS concluded that trucks and other sources of air emissions associated with all the uses set forth in HRYV's land use plan would not have any significant adverse effect on air quality in the Bronx.[1]

---

1. Shortly after the FEIS was approved, plaintiff South Bronx Coalition, *inter alia*, initiated an Article 78 proceeding to annul the lease between the DOT and the HRYV. This action was ultimately dismissed as untimely *See South Bronx Clean Air Coalition v. New York State Department*

In 1996, the Yard was the subject of a Supplemental Final Environmental Impact Statement ("SFEIS") that was prepared for a proposed Bronx Community Paper Co., "de-inking facility" that was to occupy approximately 36 acres in the eastern portion of the Harlem River Yard. The SFEIS concluded that the proposed facility would not have a significant negative environmental impact on the area surrounding the Yard.[2]

On September 15, 1997, the New York State Department of Environmental Conservation ("DEC") issued defendant USA Waste a permit to construct and operate a 3,000 ton per day solid waste transfer station to be located within the Harlem River Yard site. Construction of the facility began in June 1998 and is expected to be completed within 12 months. In conjunction with the issuance of the permit, DEC issued a "Findings Statement" concluding that although the overall "footprint area" of the USA Waste facility would be larger than contemplated by the 1993 FEIS, this difference would "not result in significant adverse environmental impacts, and will have some additional benefits ..." (See Affidavit of Anthony M. Riccio Jr. dated August 5, 1998 ("Riccio Aff."), Ex. D at 2). DEC also found that the conclusion of the 1993 FEIS that the waste facility would have no adverse impact on air quality in the Bronx was still valid. (Id.)

### III. The Walnut Depot

Located adjacent to the Yard is the Walnut Depot, a two-story, 338,000 square foot building located at 900 East 132nd Street in the South Bronx. The building was originally constructed as a warehouse in 1931 and used by F.W. Woolworth Company. In 1979, MTA's operating agency, the New York City Transit Authority ("NYCTA") purchased the building for $1.5 million. The funds for this transaction were provided by the Federal Transit Administration ("FTA"), which, under the auspices of the United States Department of Transportation ("DOT"), makes grants to assist states and local agencies in financing the planning, development, construction and improvement of mass transpor-

tation facilities. See 49 U.S.C. § 5301(f). In 1981, FTA provided NYCTA with an additional $13 million to convert the property into a bus garage, material storage facility and bus training school. MTA no longer receives any federal funds and was depleted of its last federal operating funds in 1997.

In November 1997, ESDC, a New York public authority and public benefit corporation created by the New York State Legislature as the "Urban Development Corporation" for the purpose of generating economic development projects, offered to purchase the Walnut Depot. MTA had already determined that the Walnut Depot was functionally and operationally obsolete as a bus depot and had decided to replace it by reconstructing the Coliseum Bus Depot, located in the central Bronx at 177th Street and the intersection of Bronx River Parkway and the Cross Bronx Expressway. When it opens, the Coliseum Depot will be a state-of-the-art facility that will accommodate 220 compressed natural gas buses, and all bus routes formerly assigned to Walnut Depot will be reassigned to the Coliseum Depot. In response to ESDC's offer, MTA decided to accelerate the closure of the Walnut Depot and to use the proceeds from the sale of the Walnut Depot towards the Coliseum Project. The construction contract for the Coliseum Depot was awarded in December 1996 and construction is expected to be completed in approximately two years. Until then, bus routes formerly assigned to the Walnut Depot will be relocated to other bus depots.

Once title to the Walnut Depot property is transferred, ESDC will lease the property to HRYV, which will sublease it, together with an adjacent 8.3 acre parcel of land on the Yard (currently used as a car tow pound by the New York City Police Department) to the Post. The Post will use the combined 16.4 acre site to develop a new state of the art color printing plant. The Post claims that it has been losing millions of dollars annually and needs the new printing facility in order to remain competitive. The Post also claims that if it is not allowed to build the plant in

of Transportation, 218 A.D.2d 520, 630 N.Y.S.2d 73, 75 (1st Dept.1995).

2. The de-inking facility has not yet been built.

the Bronx, it will have to relocate outside the city, thus depriving Bronx residents of the employment opportunities generated by the Post facility. Bronx Borough President Fernando Ferrer has submitted two affidavits supporting the Post project on the grounds that it will bring substantial economic benefits to the Bronx.

## IV. *The Environmental Review*

By notice dated March 2, 1998, ESDC indicated that it would serve as "lead agency" for purposes of the environmental review required by the State Environmental Quality Review Act ("SEQRA"), ECL, Art. 8 (McKinney 1997). Pursuant to directions from the ESDC, a full Environmental Assessment Form ("EAF") was prepared by Alee, King, Rosen & Fleming, an environmental consultant retained by the Post. This study concluded that the sale of the Walnut Depot and the use of part of its site for the Post's new printing plant would have no significant environmental impact beyond those that had been examined in the 1993 FEIS and the 1996 SFEIS.

After receiving the EAF, MTA, pursuant to 49 CFR § 18.31, a federal regulation applicable to disposition of property acquired with DOT grants, sought FTA's concurrence to apply the proceeds of the Walnut Depot sale to the Coliseum project. By letter dated March 19, 1998, FTA concurred in this request. On March 26, 1998 the MTA Board unanimously approved the sale of the Walnut Depot to ESDC for $11.5 million. On May 29, 1998, ESDC issued a "negative declaration" determining that the sale of the Walnut Depot would have no significant environmental impact on the area. The negative declaration referenced the 1993 FEIS and the 1996 SFEIS, noting that

No violations of national ambient air quality standards were identified in association with either the 1993 FEIS Harlem River Yard Project or the Bronx Community paper project [SFEIS]. Based on the significantly less traffic to be generated under the New York Post project, no air quality

impacts are associated with the proposed action.

(Affidavit of Rachel Shatz dated August 6, 1998, ¶¶ 28–29).

Though title to the Walnut property has not yet been transferred, MTA has already begun the process of de-commissioning the depot by removing, *inter alia*, machinery and equipment such as fuel storage tanks, fueling and maintenance equipment and a large emergency generator. MTA has also reassigned all buses formerly assigned to the Walnut Depot and implemented "road relief" measures designed to minimize the increase in bus miles caused by the re-routing. Under the employees' collective bargaining agreement, reassignment of bus routes requires a "labor pick," whereby employees are allowed to bid on new slots. A labor pick was conducted in the spring of 1998 and resulted in a significant shifting of depot assignments and work schedules. MTA has also made capital improvements and equipment reinstallations at other depots to accommodate the reassignment of buses from the Walnut Depot.

The Post project is also underway. As of August 20, 1998, fuel storage tanks, which had been out of use at the Yard for some time, were in the process of being removed. Demolition of the balance of the existing structures at the site and commencement of construction has been scheduled to begin as soon as the tanks are completely removed. In addition, tests are being conducted to determine the extent of pilings, types of foundations and quantity of water supply required for the facility. The Post has also ordered four new color printing presses for the plant.

## V. *The Instant Action*

Plaintiffs claim that the events connected with the sale of the Walnut Depot property will have deleterious environmental effects in the South Bronx. Specifically, they claim that the re-routing of buses from the Walnut Depot pending the completion of the Coliseum Depot will result in 1,800 extra bus miles per weekday, thus generating more pollution in the South Bronx.[3] Plaintiffs seek to en-

---

**3.** MTA contends that the total bus miles added as      a result of the Walnut Depot closing will be only

join the sale of the Walnut Depot property and to order the return of buses that have been transferred to other bus depots on the grounds that (1) defendants failed to conduct an environmental review, as required by the National Environmental Policy Act, 42 U.S.C. §§ 4321–4370d ("NEPA") prior to entering into the transaction, (2) the expansion of the USA Waste waste transfer facility, allegedly connected to the sale of the Walnut Depot property, will create a situation in which minority residents of the South Bronx are more subject to the noxious effects of garbage than the mostly white residents of Long Island in violation of Title VI of the Civil Rights Act and (3) ESDC's negative declaration was not satisfactory under SEQRA.

Defendants have moved to dismiss the complaint, *inter alia*, on the grounds of lack of subject matter jurisdiction and failure to state a claim. For the reasons set forth below, plaintiffs' motion for a preliminary injunction is denied and defendants' motions to dismiss are granted.

## *DISCUSSION*

### I. *Applicable Standards*

■ A party seeking to enjoin an action by MTA taken pursuant to its statutory authority[4] must establish (1) that the injunction is necessary to prevent irreparable harm and (2) that it is likely to succeed on the merits. *Molloy v. Metropolitan Transportation Authority*, 94 F.3d 808, 811 (2d Cir.1996). "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). On a motion to dismiss, the allegations in the complaint are liberally construed and considered in the light most favorable to the pleader. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). However, the court is not required to accept

as true "conclusions of law or unwarranted deductions." *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 771 (2d Cir. 1994) (citations omitted). The legal viability of plaintiffs' claims is evaluated in light of these standards.

### II. *NEPA*

■ NEPA provides that "all agencies of the Federal Government" shall, upon proposing a "major federal action" that will "significantly affect the quality of the human environment," prepare a detailed statement describing the environmental impact of the proposed action. 42 U.S.C. § 4332(2)(C). "The fundamental purpose of NEPA is to compel federal decision makers to consider the environmental consequences of their actions." *Atlanta Coalition on the Transportation Crisis v. Atlanta Regional Commission*, 599 F.2d 1333, 1344 (5th Cir.1979). "But Congress did not intend NEPA to apply to state, local, or private actions, hence, the statute speaks only to 'federal agencies' and requires impact statements only as to 'major federal actions.'" *Id.* In determining whether an action constitutes a "major federal action" under NEPA, "courts have looked to the nature and scope of the federal action being undertaken and have considered the usefulness to the federal decision-making process of the information an impact statement would provide both in determining whether an impact statement is required at all … and in deciding what kind of statement need be prepared." *Id.* (citations omitted).

■ Although "[d]etermining whether a program is sufficiently 'federal' to render it subject to NEPA will often entail analysis of the amount and significance of federal aid … the presence of federal financial assistance is generally just one factor in the analysis of whether there is sufficient federal control over, responsibility for, or involvement with an action to require preparation of

101.97 miles per weekday, the equivalent of adding less than 1 extra bus into service per year, and that this extra mileage will be eliminated in two years when the Coliseum Depot is reopened.

4. MTA's decision to sell Walnut Depot was taken, *inter alia*, pursuant to its statutory authority to dispose of property no longer necessary for transportation uses. *See* N.Y. Pub. Auth. Law § 1204(3) (McKinney 1982).

an EIS." *Id.* at 1347. (citations omitted). Rather, "the distinguishing feature of federal involvement [under NEPA] is the ability to influence or control the outcome in material respects. The EIS process is supposed to inform the decision-maker. This presupposes the decision-maker has judgment to exercise. Cases finding 'federal' action emphasize authority to exercise discretion over the outcome." *Landmark West! v. United States Postal Service,* 840 F.Supp. 994, 1005 (S.D.N.Y.1993) (internal quotation marks and citations omitted). Absent some indication that the "federal government has discretion over substantial portions of the project NEPA ... provides no basis for enjoining [the project]." *Macht v. Skinner,* 916 F.2d 13, 20 (D.C.Cir.1990).

The federal control requirement is the result of the fact that "the twofold purpose of NEPA is 'to inject environmental considerations into the federal agency's decision making process' and 'to inform the public that the [federal] agency has considered environmental concerns in its decision making process.'" *Id.* at 18 (quoting *Weinberger v. Catholic Action of Hawaii/Peace Education Project,* 454 U.S. 139, 143, 102 S.Ct. 197, 70 L.Ed.2d 298 (1981)). Thus, "where ... state and local agencies are solely responsible for the contents of the plan, the projects proposed, and the improvements recommended, and the adoption of the plan in no way obligates the federal government, the plan cannot be said to be 'federal' for the purposes of NEPA." *Atlanta Coalition,* 599 F.2d at 1347.

Both MTA and ESDC are New York public authority and public benefit corporations created by the New York State Legislature. *See* N.Y. Pub. Auth. Law § 1200 *et seq.* (McKinney 1982) and N.Y. Unconsol. Laws § 6254 (McKinney 1979). FTA is statutorily prohibited from regulating the operational decisions of mass transit systems, *see* 49 U.S.C. § 5324(c), and its role in this case was limited to providing funds for the purchase and construction of the Walnut Depot and concurring in MTA's proposal to apply the proceeds of the sale to the Coliseum project

(which is not the subject of this lawsuit). There is no allegation that FTA (or any other federal agency) had any control over (a) MTA's decision to close the Walnut Depot, (b) MTA's decision to sell the Walnut Depot to ESDC, (c) MTA's decision to re-route buses formerly assigned to the Walnut Depot to other depots, (d) ESDC's decision to lease the property to HRYV, (e) HRYV's decision to sub-lease the property to the Post, (f) the Post's decision to construct a new printing facility on the Yard, or (g) DEC's decision to grant USA Waste a permit to construct a 3,000 ton waste facility on the Yard. As plaintiffs conceded at oral argument, they are unaware of any case applying NEPA to such limited federal action. (Transcript of August 31, 1998 ("Aug. 31 Tr.") at 26.) Accordingly, plaintiffs' NEPA claim is dismissed.[5]

**III.   Title VI**

■   Plaintiffs have also alleged violations of Title VI of the Civil Rights Act of 1964. Section 601 of Title VI, 42 U.S.C. § 2000d, provides:

> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

Section 601 only reaches instances of intentional discrimination. *See Alexander v. Choate,* 469 U.S. 287, 293, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985).

■   Plaintiffs' Title VI claims are based on the allegation that MTA in its role as the Long Island Railroad ("LIRR") entered into certain agreements restricting the handling and transportation of solid waste in Queens and on Long Island. (Am. Compl. ¶¶ 27–8; 50–57). According to plaintiffs, the combination of the expansion of the USA Waste waste transfer facility within the Yard and the MTA's agreements restricting the transfer of solid waste on Long Island will create a situation in which minority residents of the

---

5.   40 C.F.R. 1508.25(a)(1), cited by plaintiffs for the proposition that major federal actions under NEPA include "connected actions" that are "interdependent parts of a larger action," is inappo-

site. That provision defines the scope of the required environmental review. It does not address the question of when such a review is required.

Bronx suffer the noxious effects of garbage to a greater degree than the mostly white residents of Long Island. (Am.Compl.¶¶ 54–57). Plaintiffs allege, upon information and belief, that these actions "are part of a policy of the defendants . . . to site obnoxious environmental activity only in minority neighborhoods and to exclude such activities from neighborhoods occupied by white residents of the State." (Am.Compl.¶ 54). Plaintiffs further allege that these actions were "deliberate" and "specifically designed to protect white residents . . ." (*Id.*). Plaintiffs have offered no other allegations in support of their intentional discrimination claim. They have not even identified the dates, or the specific terms of, the alleged agreements which form the basis of this claim. It is well established that "[a] complaint containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss." *Leon v. Murphy,* 988 F.2d 303, 311 (2d Cir.1993) (quoting *Sommer v. Dixon,* 709 F.2d 173, 175 (2d Cir.1983)) (subsequent citations omitted). In this case, plaintiffs have offered only "general" and "conclusory" allegations and their Title VI intentional discrimination claim is therefore dismissed.

▮ Although Section 601 of Title VI only applies to intentional discrimination, Section 602 of Title VI (42 U.S.C. § 2000d–1), which directs and authorizes federal agencies to effectuate the provisions of Section 601, authorizes federal agencies to promulgate regulations prohibiting actions which have a "disparate impact" on minorities. *Alexander,* 469 U.S. at 293, 105 S.Ct. 712. Thus, in addition to their claim under Section 601 of Title VI, plaintiffs also allege a private right of action under Section 602 challenging the alleged "disparate impact" of defendants' actions under regulations promulgated by the United States Department of Conservation pursuant to Title VI. (Am.Compl.¶¶ 58–61).

To establish liability under the Title VI regulations disparate impact scheme, a plaintiff must first demonstrate by a preponderance of the evidence that a facially neutral practice has a disproportionate adverse effect on a group protected by Title VI. If the plaintiff makes such a prima

facie showing, the defendant then must prove that there exists a substantial legitimate justification for the challenged practice in order to avoid liability. If the defendant carries this rebuttal burden, the plaintiff will still prevail if able to show that there exists a comparably effective alternative practice which would result in less disproportionality, or that the defendant's proffered justification is a pretext for discrimination.

The plaintiff's duty to show that a practice has a disproportionate effect by definition requires the plaintiff to demonstrate a causal link between the defendant's challenged practice and the disparate impact identified. Thus, the plaintiff cannot make out a prima facie disparate impact claim if the evidence tends to show that even had the defendant not engaged in the challenged practice, the same disparate impact would nonetheless have existed.

*Elston v. Talladega County Bd. Of Educ.,* 997 F.2d 1394, 1407 (11th Cir.1993) (citations omitted).

As an initial matter, there is a serious question as to whether plaintiffs may even bring a "disparate impact" private cause of action under federal regulations promulgated pursuant to Section 602 of Title VI. Plaintiffs rely on *Chester Residents Concerned for Quality Living v. Seif,* 132 F.3d 925, 937 (3rd Cir.1997) in which the Third Circuit held that private plaintiffs may maintain such an action. However, *Chester Residents* was recently summarily vacated by the Supreme Court and remanded to the Third Circuit with instructions to dismiss. *See Seif v. Chester Residents Concerned for Quality Living,* — U.S. ——, 119 S.Ct. 22, 141 L.Ed.2d 783 (1998). It is not clear whether a private right of action under Section 602 of Title VI still exists after *Seif* and the parties have not developed this issue in their submissions. However, at oral argument, plaintiffs conceded that, as a result of *Seif,* "there is a question as to whether we have a Title VI claim at this time." (Aug. 31 Tr. at 23.) In any event, we need not reach this issue because plaintiffs' allegations are insufficient to support even a prima facie case of "disparate impact" discrimination under Title VI.

Plaintiffs contend that 79% of the people who live between 155th and 179th Streets from the Hudson River to the East River are Hispanic and African–American. They claim that the rates of asthma for residents of Washington Heights and Harlem are among the highest in the country, and cite an article in the New York Daily News reporting that in these two communities as many as 17% of children suffer from asthma. They have also attached an affidavit from a local doctor attesting to the high number of asthma patients in the area. Finally, plaintiffs assert that "[t]he court can take judicial notice that the South Bronx is poor and minority, while much of Long Island is mostly middle class and white." (Plaintiffs' Reply Memorandum of Law at 5.) Plaintiffs have offered no other evidence in support of their "disparate impact" claim. Lacking from their submissions is any analytical comparison of the subject locations with regard to (1) racial and ethnic composition, (2) volume of waste transferred, (3) volume of waste generated, (4) costs of waste haulage, (5) environmental effects of waste haulage or (6) health effects of waste haulage. Conceding the lack of evidence, plaintiffs' counsel stated at oral argument "I will tell you that our Title VI claim is the weakest thing before you at the present time. I would suggest that our evidence there is not persuasive at this point." (Aug. 31 Tr. at 29.) Accordingly, plaintiffs' "disparate impact" claim is dismissed. *See New York Urban League, Inc. v. State of New York,* 71 F.3d 1031, 1038 (2d Cir.1995) (disparate impact under Title VI requires "a reliable indicator of disparate impact" and "an appropriate statistical measure" that takes into account all relevant bases of comparison).

## IV. *SEQRA*

Finally, plaintiffs allege that MTA violated SEQRA by approving the sale of the Walnut Depot prior to the preparation or consideration of an adequate environmental review. Having dismissed plaintiffs' claims under federal law, this Court declines to exercise ancillary jurisdiction over this pendent state claim under 28 U.S.C. § 1367(c). As the Second Circuit held in *Castellano v. Bd. of Trustees of Police Officers' Variable Supplements Fund,* 937 F.2d 752, 758 (2d Cir.1991), a district court should not maintain jurisdiction over ancillary state claims "even though not insubstantial" if the federal claims are dismissed before trial (quoting *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)). *See also Calzaturificio Rangoni S.p.A. v. United States Shoe Corp.,* 868 F.Supp. 1414, 1421 (S.D.N.Y.1994) ("Where federal claims are disposed of before trial, it is appropriate for the pendent state claims to be dismissed as well.")

## CONCLUSION

For the reasons stated, plaintiffs' motion for a preliminary injunction is denied and defendants' cross-motions to dismiss the complaint are granted. The Clerk of Court is directed to close this case.

SO ORDERED.