NEW YORK CITY ENVIRONMENTAL
JUSTICE ALLIANCE, et al.,
Plaintiffs,

v.

Rudolph W. GIULIANI, Mayor
of the City of New York,
et al., Defendants.

Green Guerillas, et al., Plaintiffs,

v.

Rudolph W. Giuliani, Mayor of
the City of New York, et
al., Defendants.

Nos. 99 Civ. 3330(AGS),
99 Civ. 3331(AGS).

United States District Court,
S.D. New York.

June 4, 1999.

Foster Maer, Puerto Rican Legal Defense and Education Fund, New York City, Alan Levine, New York City, for plaintiff.

Beth D. Jacob, Brobeck Phleger & Harrison LLP, New York City, for plaintiff.

Susan E. Amron, Deputy Chief, Environmental Law Division, New York City Law Department, Office of the Corporation Counsel, New York City, for defendant.

## OPINION AND ORDER

SCHWARTZ, District Judge.

Currently before the Court is the New York City Environmental Justice Alliance's motion for a preliminary injunction restraining the City from selling or destroying prior to the determination of this action approximately 1, 100 City-owned parcels comprising approximately 600 community gardens.[1]

▌ In order to be entitled to a preliminary injunction, a party must demonstrate that it will suffer irreparable harm and that it is likely to succeed on the merits. Plaintiffs maintain that, as an alternative to demonstrating likely success on the merits, they are entitled to show serious question as to the merits coupled with a balance of hardships tipping decidedly in their favor. This lower standard, however, does not apply where government action taken in the public interest is being challenged. *See*, e.g., *Velazquez v. Legal Servs. Corp.*, 164 F.3d 757, 762 (2d Cir. 1999).

The City has submitted affidavits setting forth its intention to dispose of certain properties prior to June 30, 1999 and to dispose of many of the other properties at issue at an undefined future time. The City contends that with regard to all of such properties, it is acting in the public interest. The City submits that the June closings will result in the construction of more than 300 units of rental and owner occu-

1. These actions originally came before the Court on plaintiffs' motions for a preliminary injunction and a temporary restraining order in regard to the auction of approximately 115 community gardens. By agreement of the parties and with the consent of Judge Jones, case number 99 Civ. 3330 was transferred to this Court's docket, and consolidated with case number 99 Civ. 3331. On May 12, 1999, following oral argument on the motions and before the Court issued its decision, the parcels were withdrawn from the auction and designated for purchase by the Trust for Public Land and the New York Restoration Project. As the action brought by the Green Guerilla plaintiffs concerns only the auction plots, they are not involved in the instant motion.

pied housing in four separate construction projects. (Declaration of James F. Lima ¶ 4.) Six parcels are located in Central Harlem, where the home ownership rate is currently only six percent. (*Id.* ¶ 6.) Forty-one two- and three-family brownstones, consisting of 113 housing units, are planned for development on these parcels, involving an investment of over $17 million. (*Id.* ¶ 7.)

Three parcels are part of a project being developed in the Williamsburg section of Brooklyn, where there is a "tremendous" need for affordable housing. (*Id.* ¶ 9.) Eighty two-family homes are scheduled for construction, at a cost of $18 million. (*Id.*) Finally, one parcel scheduled for a June closing (which appears to contain a squatter garden) is located amidst a construction project in the East New York section of Brooklyn, which also currently has very low home ownership levels. (*Id.* ¶ 10.) This project has a total development cost of $7.5 million and will consist of 34 two-family homes. (*Id.*)

In addition to the June closings, plaintiffs have identified other parcels which they consider to be "at risk of immediate destruction." (Second Declaration of Foster Maer ("Second Maer Decl.") Ex. A.) Two of these are located in Williamsburg and are part of a larger group of twelve parcels on which twenty new family housing units will be built. (Declaration of Susan Goldfinger ¶ 10.) Sale of these lots was approved unanimously by Community Board No. 1 and by the Brooklyn Borough Board. (*Id.* ¶ 11.) Although aware that the proposed project involved parcels containing community gardens, both bodies determined that the use of the properties for housing was more important. (*Id.*)

Another three "at-risk" parcels are in Manhattan. Two are part of a project in East Harlem which will provide space for medical and related services for elderly residents of the community. (*Id.* ¶ 12.) The project is also expected to generate 100 jobs during construction and 125 permanent jobs upon completion. (*Id.*) The third parcel is also in East Harlem and is on a site which will possibly be developed for large retail uses. (*Id.* ¶ 13.) A portion of the site is zoned for commercial use and is in an area which is currently underserved by commercial development. (*Id.*)

Yet another "at-risk" parcel is located in lower Manhattan and is part of a larger site to be developed by Gethsemane Baptist Church. (Supplemental Declaration of Mary Bolton ¶ 5.) An eight story building will be constructed which will provide fifteen units of affordable rental housing, a community facility, and 5,000 feet of open space which will be dedicated as a garden and will be open for use by community residents. (*Id.*)

It is apparent that the City is acting in the public interest in creating affordable housing, market-rate housing units, elderly medical- and related-care facilities and other community or municipal facilities including commercial space in neighborhoods which are predominantly minority and low-income. The Court finds, however, as a threshold matter, that plaintiffs have demonstrated that they may well suffer irreparable harm in the absence of a preliminary injunction. Plaintiffs have identified 56 instances in which community gardeners have been given "Termination Notices," a step which is often followed by destruction of the garden. (Second Maer Decl. ¶ 11.) Furthermore, the City acknowledges that seven Green-Thumb parcels in Manhattan will be sold by June 30, 1999. (Second Declaration of Susan Amron ¶ 9.)

Although the Court recognizes the seriousness of this matter and is sympathetic to plaintiffs' needs and concerns, the record does not establish, as a matter of law, that there is a likelihood that plaintiffs will succeed on the merits of their case. Plaintiffs have raised several claims, and we will discuss each in turn.

Plaintiffs argue first that the sale or destruction of community gardens will have a disparate impact on black and Hispanic communities in violation of Title VI

of the Civil Rights Act of 1964 ("Title VI") and of regulations promulgated by the Environmental Protection Agency ("EPA") to implement Title VI. Section 601 of Title VI provides that:

No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. § 2000d.

Section 602 provides, in relevant part, that:

Each Federal department and agency which is empowered to extend Federal financial assistance to any program or activity ... is authorized and directed to effectuate the provisions of section 2000d of this title ... by issuing rules, regulations, or orders of general applicability.

42 U.S.C. § 2000d–1.

Pursuant to Section 602, the EPA adopted regulations which state:

A recipient shall not use criteria or methods of administering its program which have the effect of subjecting individuals to discrimination because of their race, color, national origin, or sex.

40 C.F.R. § 7.35(b).

Plaintiffs allege both a direct violation of Title VI and a violation of the EPA regulation promulgated under Title VI. Section 601 of Title VI, however, has been interpreted by the Supreme Court to prohibit intentional discrimination only. *See Guardians Ass'n v. Civil Serv. Comm'n,* 463 U.S. 582, 610–12, 641–42, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983). The amended complaint raises no allegations of intentional discrimination, and there is therefore no likelihood that plaintiffs could succeed on a Section 601 claim.[2]

■ In regard to plaintiffs' claim under the EPA regulation, the Court finds that it is unlikely that a private right of action is available to plaintiffs. Title VI does not expressly authorize a private right of action, and so, if one exists, it must be implied. In *South Bronx Coalition for Clean Air, Inc. v. Conroy,* 20 F.Supp.2d 565, 572 (S.D.N.Y.1998), this Court expressed serious doubt about whether a private right should be implied under section 602 of Title VI. Nothing in plaintiffs' papers or argument convinces us otherwise. Indeed, while the City has provided the Court with a thorough and persuasive analysis of the factors to be used in determining whether a private right of action may be implied, *see Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), the Green Guerilla plaintiffs have addressed these factors in only the most cursory fashion, and the Environmental Justice Alliance plaintiffs have not addressed them at all.

Instead, the Green Guerilla plaintiffs rely primarily on three cases, none of which the Court finds to be apposite.[3] In *Cannon v. University of Chicago,* 441 U.S. 677, 694–97, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), the Supreme Court stated that a private right of action exists when bringing suit directly under Title VI, but said nothing about actions brought under agency regulations promulgated pursuant to Title VI. *Chester Residents Concerned for Quality Living v. Seif,* 132 F.3d 925, 937 (3d Cir.1997), did hold that a private right of action is available under EPA regulations, but was vacated by the Supreme Court and remanded to the Third Circuit with instructions to dismiss. *See Seif v. Chester Residents Concerned for Quality Living,* —— U.S. ——, 119 S.Ct. 22, 141 L.Ed.2d 783 (1998). Finally, although *Chester Residents* states that five justices

---

2. Although it is not entirely clear from the amended complaint, the Court assumes that plaintiffs are not raising a claim directly under Section 602, which merely authorizes regulations and does not prohibit any particular conduct.

3. We discuss these cases because the Environmental Justice Alliance plaintiffs have not briefed the private right of action issue, and so the Court assumes that they are relying on the arguments advanced by the Green Guerilla plaintiffs.

on the *Guardians* Court implicitly recognized a private right of action under regulations promulgated under Section 602, this Court finds that the *Chester Residents* court's reading of *Guardians* (*see Chester Residents,* 132 F.3d at 930) is insupportable, and the Court declines to accept that interpretation.

In sum, the Court is not persuaded that a private right of action is available to plaintiffs in challenging the City's actions under EPA regulations,[4] and we therefore find that plaintiffs have little, if any, likelihood of succeeding on the merits of this claim.

■ Plaintiffs next argue that the sale or destruction of community gardens would violate the First Amendment of the United States Constitution, because the City would be acting in retaliation for the gardeners' demonstrations and protests. Plaintiffs proffer no evidence of the state of mind of any City official, or of any retaliatory intent. Rather, plaintiffs simply argue that there is no explanation for the City's desire to sell community garden lots other than retaliation. Such speculation is insufficient to demonstrate a likelihood of success on the merits. While it is possible that discovery will reveal improper motivation on the part of City officials, such evidence has not been presented to the Court at this time.

■ Plaintiffs next argue that the sale of community garden lots would violate regulations promulgated under the Housing and Community Development Act, 42 U.S.C. §§ 5300 *et seq.* The City receives Community Development Block Grant (CDBG) funding for the GreenThumb program. 24 C.F.R. § 570.505 governs the use of real property acquired or improved using CDBG funds, and plaintiffs maintain that the City's sale of the lots will not be in compliance with regulations. Section 570.505, however, applies only to "real property ... which was acquired or improved in whole or in part using CDBG funds *in excess of $25.000.*" (emphasis added) Plaintiffs proffer no evidence that any lot received more than $25,000 in CDBG funding. Rather, plaintiffs note that in 1997, the City received $565,298 for the GreenThumb program. The Court finds that the $25,000 figure in § 570.505 applies to each lot, and not to the aggregate amount of funding received by the City. We therefore find that this claim has no likelihood of success on the merits.[5]

■ Plaintiffs next argue that the sale of the lots on which the gardens stand is subject to review under the State Environmental Quality Review Act ("SEQRA"), N.Y.Envtl.Conserv.Law §§ 8–0101 *et seq.* It would appear that plaintiffs lack standing to raise this claim. In a 1997 case involving community gardens, the New York County Supreme Court, citing several earlier New York cases, stated, "Clearly, without a license to property or with only a license revocable at will, one lacks a legally cognizable interest upon which to base standing to complain of decisions affecting use of that property." *New York City Coalition for the Preservation of Gardens v. Giuliani,* 175 Misc.2d 644, 670 N.Y.S.2d 654, 659 (Sup.Ct.1997). According to the City, any leases or licenses

---

4. Having determined that no private right of action exists, the Court need not reach the merits of plaintiffs' disparate impact claim. We note, however, that plaintiffs' statistical analysis seems to focus largely on the allegedly greater availability of parks in white neighborhoods, data which the Court considers irrelevant to the community gardens issue. We also need not reach the question of whether the City has shown a substantial legitimate justification for its actions but note that, as detailed *supra,* the City clearly appears to be acting in the public interest.

5. Plaintiffs' contention that, because the City receives money under the "public facilities and improvements" category of CDBG funding, it may only sell lots to not-for-profit entities also has no likelihood of success on the merits. 24 C.F.R. § 570.201(c) states only that "nonprofit entities ... *may* acquire title to public facilities." (emphasis added). The Court finds that plaintiffs have interpreted this provision incorrectly.

which plaintiffs may hold are revocable by the City. (Amron Second Decl. ¶ 5.) Plaintiffs do not rebut this claim, and therefore fail to demonstrate a likelihood of success on the merits of their SEQRA claim.

Finally, plaintiffs argue that the sale or destruction of community gardens would violate the New York City Administrative Procedures Act ("CAPA"), N.Y. Charter §§ 1041 *et seq.*, in that it represents the City changing a policy without having gone through the proper rulemaking procedures. First, for the reasons which we just discussed, the Court is not convinced that plaintiffs have standing to raise this claim. Second, plaintiffs have proffered no evidence and cited no legal precedent for their assertion that the City's actions at issue here represent illegal rulemaking. Not every change in City policy may be construed as "rulemaking." What is and is not a "rule" is defined in §§ 1041(5) and 1041(5)b. Plaintiffs have not explained to the Court what "rule" the City has promulgated by its actions, nor what brings these actions under CAPA's rubric. The Court therefore finds that plaintiffs have not, at the present time, demonstrated a likelihood of success on the merits of this claim.

In sum, the Court finds that plaintiffs have properly alleged irreparable harm, but have failed to demonstrate a likelihood of success on the merits of their case. Accordingly, plaintiffs' motion for a preliminary injunction is denied.

SO ORDERED.