214 F.3d 65 (2nd Cir. 2000)
 NEW YORK CITY ENVIRONMENTAL JUSTICE ALLIANCE, MORE GARDENS! COALITION, NEW YORK CITY COMMUNITY GARDEN COALITION, CHERRY TREE GARDEN, RAFAEL BUENO, ALICE MORRIS, ELIZABETH BUTLER, RICHARD SMITH, and CARMEN PABON, on behalf of themselves and all others similarly situated, Plaintiffs-Appellants,
v.
RUDOLPH W. GIULIANI, Mayor of the City of New York, WILLIAM J. DIAMOND, Commissioner of Citywide Administrative Services, and THE CITY OF NEW YORK, Defendants-Appellees.
 Docket No. 99-7713
August Term 1998
 UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
 Argued: July 15, 1999
Decided: August 13, 1999
Opinion: May 31, 2000
 
 Plaintiffs appeal from a June 4, 1999 interlocutory order of the United States District Court for the Southern District of New York (Allen G. Schwartz, District Judge) denying their motion for a preliminary injunction against the City of New York; its Mayor, Rudolph W. Giuliani; and its Commissioner of Citywide Administrative Services, William J. Diamond. The plaintiffs sought to restrain the City from selling or bulldozing any of 1,100 City-owned parcels comprising approximately 600 community gardens on the grounds, inter alia, that any such sale or changed use of the City-owned parcels would have a disproportionately adverse impact on the City's African-American, Asian-American, and Hispanic residents in violation of regulations promulgated by the United States Environmental Protection Agency to implement Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§2000d et seq. The district court denied the plaintiffs' motion for an injunction based on its conclusion that they had failed to demonstrate a likelihood of success on the merits.
 Affirmed.
 FOSTER S. MAER, Puerto Rican Legal Defense & Education Fund, Inc., New York, NY (Sara E. Rios, Christopher J. Arias-Piranio, Puerto Rican Legal Defense & Education Fund, New York, NY, Julie H. Hurwitz, Quita A. Sullivan, N.L.G. Sugar Law Center for Economic and Social Services, Detroit, MI, Alan Levine, New York, NY, of counsel, on the brief), for Plaintiffs-Appellants.
 SUSAN E. AMRON, Assistant Corporation Counsel of the City of New York, New York, NY (Michael D. Hess, Corporation Counsel of the City of New York, Pamela Seider Dolgow, Christopher Reo, Christopher King, John Hogrogian, Assistant Corporation Counsel of the City of New York, New York, NY, of counsel, on the brief), for Defendants-Appellees.
 Before: WALKER, LEVAL, and SACK, Circuit Judges.
 SACK, Circuit Judge:
 
 
 1
 On June 4, 1999, the United States District Court for the Southern District of New York (Allen G. Schwartz, District Judge) issued an interlocutory order denying the plaintiffs' motion for a preliminary injunction. See New York City Envtl. Justice Alliance v. Giuliani, 50 F. Supp. 2d 250 (S.D.N.Y. 1999) ("NYCEJA"). We affirm the order, albeit on grounds somewhat different from those relied upon by the district court.
 
 BACKGROUND
 
 2
 In May 1999, the plaintiffs brought an action against the City of New York (the "City"); its Mayor, Rudolph W. Giuliani; and its Commissioner of Citywide Administrative Services, William J. Diamond, asking the district court, inter alia, to enjoin the City from selling or bulldozing any of 1,100 City-owned parcels (the "Lots") comprising approximately 600 community gardens. The Lots had been leased to individuals and community groups for development as gardens pursuant to the City's "Green Thumb" program.[1] According to the City, selling some of the Lots will permit construction of affordable housing, facilities for medical and related services and, perhaps, retail stores.
 
 
 3
 The plaintiffs allege, however, that the City's proposed sale or changed use of the Lots would have a disproportionately adverse impact on the City's African-American, Asian-American, and Hispanic residents in violation of regulations promulgated by the United States Environmental Protection Agency (the "EPA") to implement Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§2000d et seq. The plaintiffs further assert that because the City has accepted more than $9,000,000 in grants from the United States Department of Housing and Urban Development ("HUD") pursuant to the Housing and Community Development Act (the "HCDA"), 42 U.S.C. §§ 5301 et seq., to assist residents in creating and maintaining gardens on the Lots, any proposed sale or changed use would constitute a violation of the HCDA and the regulations promulgated thereunder.
 
 
 4
 The district court concluded that the plaintiffs had shown that they would suffer irreparable harm in the absence of a preliminary injunction but that they had failed to demonstrate a likelihood of success on the merits of their claims. Specifically, the court held that Section 602 of the Civil Rights Act of 1964, 42 U.S.C. § 2000d-1, and the EPA regulations issued pursuant thereto, 40 C.F.R. § 7.35(b), did not give rise to a private cause of action and that the plaintiffs therefore could not successfully bring suit under them.[2] See NYCEJA, 50 F. Supp. 2d at 253-54. The court further held that the HUD regulations set forth at 24 C.F.R. §570.505, promulgated under the HCDA, were inapplicable to the Lots because no individual Lot received the $25,000 of federal government funding necessary for the regulations to apply. See NYCEJA, 50 F. Supp. 2d at 254. Neither the EPA nor HUD sought to be heard in the district court or this Court, and neither agency, so far as we know, has taken any action in response to the City's planned sale of the Lots.
 
 
 5
 On August 13, 1999, we affirmed the district court's denial of the plaintiffs' motion for a preliminary injunction by summary order, New York City Envtl. Justice Alliance v. Giuliani, 184 F.3d 206 (2d Cir. 1999), stating that an opinion would follow. See id. This is that opinion.
 
 DISCUSSION
 
 6
 I. Standard of Review and Showing Required for Preliminary Injunction
 
 
 7
 "We review a district court's denial of a preliminary injunction motion for abuse of discretion. An error of law or fact would constitute an abuse of discretion, but we are nevertheless free to affirm an appealed decision on any ground which finds support in the record." Beal v. Stern, 184 F.3d 117, 122 (2d Cir. 1999) (citations and internal quotation marks omitted).
 
 
 8
 As the district court correctly observed, where as here a party seeks a preliminary injunction against "government action taken in the public interest," that party must demonstrate "[1]that it will suffer irreparable harm and [2] that it is likely to succeed on the merits." NYCEJA, 50 F. Supp. 2d at 251 (citing Velazquez v. Legal Servs. Corp., 164 F.3d 757 (2d Cir. 1999)). In analyzing the first element in the instant case, the district court decided "as a threshold matter, that plaintiffs ha[d] demonstrated that they may well suffer irreparable harm in the absence of a preliminary injunction." Id. at 252. That conclusion is not disputed on appeal.
 
 
 9
 As for the second element, the district court found that the "plaintiffs ... ha[d] failed to demonstrate a likelihood of success on the merits of their case," id. at 255, and on that basis it denied their motion for a preliminary injunction. It is to this element that we now turn.
 
 II. Likelihood of Success on the Merits
 
 10
 The plaintiffs have the burden of demonstrating a likelihood of success on the merits of each of their claims under the EPA regulations and the HUD regulations. See Able v. United States, 44 F.3d 128, 130 (2d Cir. 1995). If they do not present sufficient facts or statistics to back their assertions, the "paucity of the evidence in the record" will prevent us from holding that they have shown a likelihood of success. See Beal, 184 F.3d at 129.
 
 A. EPA Regulations under Title VI
 
 11
 1. Plaintiffs' Failure to Make a Prima Facie Showing of Adverse Disparate Impact.
 
 
 12
 a) Causation. The EPA regulation promulgated pursuant to Title VI that the plaintiffs allege the sale of the Lots would violate reads:
 
 
 13
 A recipient shall not use criteria or methods of administering its program which have the effect of subjecting individuals to discrimination because of their race, color, national origin, or sex, or have the effect of defeating or substantially impairing accomplishment of the objectives of the program with respect to individuals of a particular race, color, national origin, or sex.
 
 
 14
 40 C.F.R. §7.35(b). In support of their motion for a preliminary injunction, the plaintiffs presented the district court with a substantial record, much of which tended to support their position that community gardens are highly beneficial to minority[3] communities and that the elimination of gardens would therefore have an adverse impact on some aspects of the lives of neighborhood residents.[4]
 
 
 15
 The plaintiffs understood, of course, that they were required to do more than demonstrate to the district court's satisfaction that the sale of garden lots was a bad idea. In order to establish a prima facie case of adverse disparate impact, they had to allege a causal connection between a facially neutral policy and a disproportionate and adverse impact on minorities. See Brown v. Coach Stores, Inc., 163 F.3d 706, 712 (2d Cir. 1998) (Title VII case); New York Urban League, Inc. v. New York, 71 F.3d 1031, 1036 (2d Cir. 1995) (courts in Title VI disparate impact cases look to Title VII cases for guidance). Accordingly, the plaintiffs undertook to show a causal relationship between the City's proposed sale - the facially neutral action - and an adverse disparate impact that they asserted the sale would have on certain kinds of outdoor recreational space available to minority communities.
 
 
 16
 The plaintiffs did not, in our view, submit adequate proof of causation to show a likelihood of success on the merits of their disparate impact claim. Much of their proof either concerned the sale of Lots that were removed from the auction block during the course of the litigation, or consisted of broad conclusory statements rather than evidence of causation.
 
 
 17
 The principal proof submitted by the plaintiffs in regard to the alleged causal link was the May 9, 1999 declaration of Andrew A. Beveridge, a professor of sociology with an expertise in statistics. The declaration explained that Beveridge had been "retained in the present matter by [one of the plaintiffs] to analyze the impact[] of the [defendants'] decision to sell some 150 lots at auction on May 12 and 13, 1999. These lots make up all or part of 115 'community gardens' which have been licensed" to community gardeners by the City.
 
 
 18
 The imminent auctioning of the Lots containing the 115 gardens addressed by the Beveridge affidavit was at the heart of the initial complaint filed by the plaintiffs. But the City's auction sale of these Lots never took place; it never will. "Shortly before the scheduled May 13 auction," the defendants assert and the plaintiffs do not dispute, "the City withdrew the[se] GreenThumb [community garden] parcels from auction and agreed to sell the parcels to two not for profit organizations for preservation as open space."
 
 
 19
 Soon thereafter, on May 28, the plaintiffs filed an amended complaint. It continued to focus on these same 115 community gardens even though they were no longer for sale. And the plaintiffs continued to rely on the Beveridge affidavit despite the fact that it had been rendered largely irrelevant by the City's action: Testimony that the sale of the 115 gardens would have had an adverse disparate impact on minority communities if completed did not support the claim that the sale of other Lots that remained subject to sale would have an adverse disparate impact. The Beveridge declaration therefore did not help to demonstrate that the plaintiffs were likely to succeed on the merits of their claims.
 
 
 20
 The other evidence purporting to address disparate impact was offered by Leslie H. Lowe, Executive Director of the plaintiff New York City Environmental Justice Alliance. Lowe submitted two declarations, one given before the Lots comprising the 115 gardens were taken off the market and one given afterward.
 
 
 21
 The first Lowe declaration, dated May 9, 1999, contains a wide variety of arguments and data touching on subjects as diverse as Robert Moses's designs for keeping members of minority groups away from Jones Beach, the tragic death of two children hit by trucks near their respective homes in Central Brooklyn and the South Bronx, the importance of "parks and green public spaces," the "mean open space ratio[s]" in "the 18 community districts with the fewest people of color," and the amount of parkland and green space acquired by the City on Staten Island between 1996 and 1998. The second Lowe declaration, executed on an unspecified day in June 1999, was in large measure an argumentative response to declarations filed on behalf of the City.
 
 
 22
 These Lowe submissions share the principal shortcoming of the Beveridge declaration. The May 9 declaration was prepared before the 115 gardens were taken off the auction block and was therefore directed at a state of affairs no longer in existence at the time of the district court's decision. The June declaration sought to rebut the City's responses to the first Lowe declaration, but did not address the change in circumstances during the interim.
 
 
 23
 Perhaps more important, the plaintiffs were required in the course of attempting to establish causation to employ facts and statistics that "adequately capture[d]" the impact of the City's plans on similarly situated members of protected and non-protected groups. New York Urban League, 71 F.3d at 1037. The plaintiffs therefore had to show, using an "appropriate measure," id. at 1038, that specific actions of the defendants would cause a disparate effect on similarly situated people to the detriment of a protected group. The Lowe declarations made no such showing.
 
 
 24
 The first Lowe declaration is replete with broad conclusory statements. It asserts, for example, that: "The sale of 115 gardens at the auction on May 13, 1999, will disproportionately impact [specified minority] neighborhoods;" and, "[t]he City's plan to sell off the gardens will have a disparate and adverse impact on both residents and property owners in communities of color;" and "the loss of the gardens will have" a "disparate and significantly adverse impact . . . on communities of color in New York City." The second Lowe declaration states that "[t]he extreme inequality of open space resources among community districts has a disparate impact on people of color in this city who are disproportionately concentrated in the lower income brackets," and calls "absurd" the "City's argument that because community gardens are not parks their destruction will have no impact on open space resources available to people of color in this City." But neither submission explains how the litany of miscellaneous factual assertions that they contain would tend to establish the necessary causal link between the sale of the Lots and a disparate impact on minority communities.
 
 
 25
 b) "Open Space" as a measure. In order to make out a prima facie case of disparate impact, plaintiffs must show "a significantly discriminatory impact." Connecticut v. Teal, 457 U.S. 440, 446 (1982) (Title VII case); see also New York Urban League, 71 F.3d at 1036 (courts in Title VI disparate impact cases look to Title VII cases for guidance). This showing requires that plaintiffs employ an "appropriate measure" for assessing disparate impact. New York Urban League, 71 F.3d at 1038. In New York Urban League, we concluded that the plaintiffs had failed to establish a prima facie case because they had relied on an inappropriate measure. Specifically, we found that the farebox recovery ratio - the percentage of the operating costs of the subway system and the commuter rail system, respectively, recovered through fare revenues - was not "an appropriate statistical measure of the subsidization of transportation systems" because it did "not reveal the extent to which one system might have higher costs associated with its operations." Id. at 1038. In our view, as was true in New York Urban League, the plaintiffs here failed to establish a likelihood of success on the merits primarily because they did not demonstrate the appropriateness of their proposed measure of the disparate impact of the City's sale of Lots on minority communities.
 
 
 26
 The plaintiffs in the case at bar unquestionably submitted evidence that community gardens are disproportionately located in minority neighborhoods. Moreover, they specifically identified 174 community gardens not including the original 115 that they believed were "at imminent risk of sale or destruction," and they demonstrated that 151 of these 174 gardens (over 86%) are found in districts whose populations are more than two-thirds minority. But showing that most community gardens are in minority neighborhoods and that downsizing the community gardens program would therefore entail closing a substantial number of community gardens in minority neighborhoods is simply not enough to demonstrate an adequately measured disparate impact. If it were, then the law would effectively penalize those who take steps specifically designed to benefit minorities: once a program aimed at improving a minority community was begun, its curtailment, the impact of which would be confined to the minority community, would, without more, establish a prima facie case of disparate impact. This would provide a powerful disincentive to government initiatives designed to benefit minority communities.
 
 
 27
 The plaintiffs apparently recognized that they could not rely on the loss of garden space alone. In their assertions about disparate impact, they spoke in terms of community-garden Lot sales' alleged effect not on community gardens, but on what the plaintiffs call variously "open space," "green space," "open green space," "open green space resources," and "mean open space ratio[s]." Thus, the plaintiffs alleged in substance that white community districts tend to have access to more open space than minority ones, and that the sale of community gardens would perpetuate and exacerbate this disparity.
 
 
 28
 However, as in New York Urban League, the plaintiffs chose a measure that was inadequate to allow us to ascribe significance to any alleged disparate impact of the City's actions. Most notably, they did not adequately account for their inclusion of community gardens, parks and playgrounds in their definition of the term "open space," and therefore in their measurements, but their exclusion of regional parks, such as Central Park, Prospect Park, Flushing Meadows Park, and Van Cortlandt Park, even though the inclusion of such parks could significantly affect the analysis, since many of them are located adjacent to minority communities. Counting even a fraction of the acreage of regional parks as "open space" might meaningfully reduce the impact of the loss of the relatively small community gardens on minority communities.[5]
 
 
 29
 We appreciate the generalized notion that outdoor recreational space - "open space" - is precious in minority communities and that its loss is therefore troubling. But in using "open space" as a measure, the plaintiffs needed to establish that its reduction in minority communities determines the impact of the City's actions on those communities compared with the impact of those actions on non-minority communities. See generally Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 99497 (1988) (requiring that plaintiffs offer reliable evidence of disparate impact and detailing common flaws found in proffered statistics). True, the City, which disputes the plaintiffs' use of the "open space" measure, failed to offer a helpful analysis of the plaintiffs' statistics. But the burden was on the plaintiffs to prove that the measurement was meaningful, and they did not do so.
 
 
 30
 2. Substantial Legitimate Justification for the City's Actions. Courts considering claims under Title VI regulations analogous to the EPA regulation at issue here have looked to Title VII disparate-impact employment discrimination cases for guidance. See New York Urban League, 71 F.3d at 1036 (citing cases). Following the logic of those cases, a plaintiff alleging a violation of 40 C.F.R. §7.35(b) must do more than make out a prima facie case of disparate impact. Once such a showing has been made, the burden shifts to the defendant to demonstrate the existence of "a substantial legitimate justification" for the allegedly discriminatory practice. New York Urban League, 71 F.3d at 1036 (quoting Georgia State Conference of Branches of NAACP v. Georgia, 775 F.2d 1403, 1417 (11th Cir. 1985)). If the defendant carries this burden, a plaintiff may still prove its case by demonstrating that other less discriminatory means would serve the same objective. See id.
 
 
 31
 Even if the plaintiffs had established a likelihood of success in making out a prima facie case of disparate impact, they still would not have been entitled to relief unless they further showed either (1) that the defendants were unlikely to meet their burden of showing a substantial legitimate justification for their actions, or (2) the existence of a less discriminatory alternative method of achieving the defendants' legitimate goals. See id. The City has claimed repeatedly that it plans to sell community gardens in order to build new housing and foster urban renewal. In the district court the plaintiffs did not deny that this would constitute a substantial legitimate justification for the defendants' actions.
 
 
 32
 The plaintiffs attempted instead to demonstrate that less discriminatory options were available. To this end, declarant after declarant noted that he or she had "seen" vacant lots in the vicinity of community gardens that the declarant thought could support the City's proposed new housing. But the defendants explained in great detail the processes and criteria that the City uses to select the lots that it will auction off or use for housing projects. Nothing in the evidence submitted by the plaintiffs challenged the proposition either that those processes and criteria were in fact used by the City or that they were legitimate. The plaintiffs presented no evidence that the lots mentioned by the declarants were owned by the City or were suitable for housing.[6] Thus, they did not show that the sale of these lots was likely to provide a viable alternative option to selling garden Lots. In the face of the evidence provided by the defendants, conclusory statements about the assumed availability of other buildable City-owned lots in the vicinity of particular gardens does not suffice to establish a likelihood that the plaintiffs will meet their burden of showing that a less discriminatory option is available to achieve the City's legitimate governmental goals.
 
 
 33
 * * *
 
 
 34
 Because we find that the plaintiffs failed to present evidence on the basis of which the district court could conclude that the defendants' actions would have had an impermissible adverse impact on minority communities, we affirm the order of the district court insofar as it denied the plaintiffs' motion for a preliminary injunction based on the EPA regulations. In so doing, we do not reach the broader and more portentous question upon which the district court based its resolution of this case: whether a private right of action may be brought under 40 C.F.R. § 7.35(b), and, by extension, other regulations issued by federal agencies under Title VI. Several of our sister circuits have recently decided that a private right of action exists under regulations adopted pursuant to § 602 of Title VI. See Sandoval v. Hagan, 197 F.3d 484 (11th Cir. 1999); Powell v. Ridge, 189 F.3d 387 (3d Cir. 1999). In this Circuit, the question remains an open one. In the years since Cort v. Ash, 422 U.S. 66, 78 (1975), the Supreme Court, in determining whether there is a private right of action under a statute, has viewed the predominant issue to be whether Congress intended to create or deny one. See McClellan v. Cablevision of Connecticut, Inc., 149 F.3d 161, 164 (2d Cir. 1998). The person seeking a private remedy bears the burden of demonstrating that Congress intended to make one available. See Suter v. Artist M., 503 U.S. 347, 363 (1992). While it may be difficult for a plaintiff to establish that Congress intended to create a private right of action under § 602 of Title VI, this is an issue that we need not and do not reach.
 
 
 35
 B. HUD Regulations under the Housing and Community Development Act
 
 
 36
 Lastly, we hold that the plaintiffs have not shown a likelihood of success on the merits of their claim under the HCDA and the HUD regulations promulgated thereunder. We do so substantially for the reasons set forth in the district court's opinion. NYCEJA, 50F.Supp.2d at 254.
 
 CONCLUSION
 
 37
 For the foregoing reasons, the order of the district court is affirmed.
 
 
 
 Notes:
 
 
 [1]
 "Operation Green Thumb" (or "GreenThumb") was the name given to the community development program that allowed groups to establish community gardens on vacant or distressed lots leased from the City.
 
 
 [2]
 The plaintiffs also brought a claim in the district court under Section 601 of Title VI, which has been held to prohibit only intentional discrimination. See Guardians Ass'n v. Civil Serv. Comm'n, 463 U.S. 582, 610 11 (1983) (Powell, J., concurring, joined by Burger, C.J., & Rehnquist, J.); id. at 615 (O'Connor, J., concurring); id. at 645 (Stevens, J., dissenting, joined by Brennan, Blackmun, J.J.). Because the amended complaint raised no allegations of intentional discrimination, the district court held that there was no likelihood that plaintiffs could succeed on a § 601 claim. See NYCEJA, 50 F. Supp. 2d at 253. The plaintiffs do not appeal this aspect of the district court's decision.
 The plaintiffs do, however, contend on appeal that the district court erred in failing to consider their disparate impact claim as one brought, in the alternative, under 42 U.S.C. § 1983. Because plaintiffs' purported § 1983 claim was neither raised in the complaint nor passed upon by the district court, we decline to review it on this appeal. See Thomson v. Larson, 147 F.3d 195, 206 (2d Cir. 1998).
 
 
 [3]
 We use the term "minority" as the plaintiffs' expert Andrew A. Beveridge defined the term "people of color": "Hispanic, Non-Hispanic African-American, Non-Hispanic Asian or Pacific Islander, and Non-Hispanic Native American."
 
 
 [4]
 The plaintiffs' brief characterizes the record as demonstrating that community gardens "are a source of nutritional food"; "contribute to community cooperation and cohesion which can contribute to lowering the incidence of violence"; "have multiple uses and are sites for music, dance, poetry and other cultural activities"; play a role "in establishing ethnic identity, self-esteem and pride"; and "provide free space for family celebrations and often contribute to community solidarity in multiracial neighborhoods."
 
 
 [5]
 The only reason the plaintiffs offered for excluding regional parks was that children and the elderly tend to use local parks and not regional parks. If the plaintiffs were attempting to show that the sale of garden lots had a disparate impact on the very old and the very young, that explanation might have been helpful. But the plaintiffs fail to explain how "open space" statistics excluding regional parks adjacent to minority communities - some of the most important open spaces in the city - are meaningful in determining whether, as they assert, there is a disparate impact on minority communities as a whole resulting from the City's sale of garden lots.
 
 
 [6]
 The plaintiffs did present what they called "Alternate Development Site Analys[e]s" that purported to identify all publically owned lots and community gardens in selected neighborhoods. However, they made no attempt to demonstrate that the identified, publically owned lots are suitable for the uses proposed by the City.